Case No 07-1061 RMC

Additional Documents

Same

Testimony
Wife

The City Council

Let this be filed
R.M. Coller
11/26/07

Geraldine Tally Hoble

V.

D.C.

D.C. CITY COUNCIL
GOVERNMENT OPERATIONS OVERSIGHT HEARING
RISK MANAGEMENT
AND
THE DEPARTMENT OF EMPLOYMENT SERVICES
February 16, 2007
VIOLATIONS OF POLICIES, PROCEEDURES, PRACTICES AND PROCESS OF THE LAW
BY
GERALDING TALLEY HOBBY
(301) 254-1409 (202) 528-1678

Good Morning Council Members. My name is Geraldine Talley Hobby, P. O. Box 441972, Fort Washington, MD, 20744, 301-254-1409.

This is an overview of a, timeline of issues in my particular disability compensation case.

January 1, 1967, I was hired as an Art Teacher for the D.C. Public Schools System.  While transferring from North Carolina, I worked fulltime and part-time most of my service

January 1, 1969, I received a permanent status under the Merit Personnel System which derives from the Federal Government.  Additionally, I received outstanding and excellent ratings.

May 5, 1995, wrongfully terminated from D.C.P.S. retroactive to may, 5, 1990.

September 30, 1986 injured in a job related automobile accident sustaining multiple injuries, including my neck and back.  The claim was accepted into the U.S. Department of Labor Workers Compensation Program.

February 22, 1990. I slipped and fell twice on my part time D.C.P. S. job while also working fulltime. I suffered multiple injuries. Injuries which included my neck and back which was accepted by O.D.C. and was awarded 45 days of traumatic leave. (claim No. 337-470).

Following the 45 day period I returned to work. And I used my leave/buy back, which has not been reimbursed.

April 5, 1990, I returned to work and my condition worsened and suffered a recurrence due to performing my normal physical duties and responsibilities,

June 25, 1990 my compensation case was accepted accounting to my treating Physicians diagnosis.

1990-1997, I was sent to eight Independent Medical Evaluators (I.M.E.'s) now called Additional Medical Evaluators after I wrote Additional Treating Physicians on my document.

1990- to the present the following occurred in my case: (1) irregular benefits  :(2) paid on the wrong salary/step: (3) no benefit monthly or yearly benefit statements: (4) no part time benefit payments: (5) no retroactive benefits were paid.

May 25, 1995 after 31 years of ser ice I was wrongfully terminated from D.C.P.S. retroactive to May 04 1990 and unknown to me until my employment benefits were terminated on 5coy

March1, 1997 my benefits were wrongfully fraudulently terminated based solely on two IM.E. reports and those reports were not based upon my treating physicians (Earl Mills, neurosurgeon or John Galeno, orthopedic surgeon or the whole record). In fact I was not even sent to a

neurosurgeon and an orthopedic surgeon, but to two orthopedics John Willamson and Richard Holden who didn't even know my job description or ask question about my job; who didn't receive one from OD.C. or ask for one , but wrote adverse reports not based on substantive evidence which didn't out weigh the treating physicians diagnosis. two previous I.M.E.'s Louis Levitts and Horwitts gave me whole body permanent ratings. Additionally, I.M.E.'s didn't know that I had returned to work following the 45 day period, until June 25, 1990 the day that my claim was accepted again.

1996-1997 no investigation was ever done inot my case or even questioned of the treating physicians prior to my benefits being terminated or even afterwards which the law provides. 1990 to the present. Where is the handbook for injured workers or even D.C. Law 3-177 for the public sector like the private sector, as well as for the Federal Government Civil service status employees? What is the purpose for the Disability Compensation Program and the mission? Why has the Program been absorbed into ORM and why has it become subordinate to it? There is and continues to be violations of the D.C. 3-177 and the D.C. Compensation Act, as well as other laws which need to be identified by OR.M. and to which claimants do these laws apply?

O.R.M's dysfunction is clear, because it sets the stage for an adversarial (demonic) confrontation from the devil himself rather than a humanitarian aide.

September 17, 2004 in Acting Chief Officer O.B.N. James Joacobs repass to the American with Disability Act but doesn't mention that ORM and the Third Party Administrator violates this Federal Law.

October 30, 3004  He

September 17, 2004 he

February 28, 2006 Kelly Valentine, Jortmen Chief Risk Officer

Let me say in closing that the City Counsel Oversight Committee of GY 2004 recommended to the City Council that the D.C. Office of Risk Management be abolished in it's entirety due to the ongoing and historical issues of O.R.M.'s administration and the Disability Compensation Program should be assigned to the D.C. Office of Personnel or should it e be placed back under the Department of Employment Services.  At any rate the City Council's direct oversight as well as the Federal Government's U.S. Congress oversight is crucial

Privatization- Third Party Administration. What is needed is efficiency and effectiveness as well as accountability, competence, ethics, character, "trustworthiness, as well the humanitarian aspect that is with in the purpose of a compensation Program for the Federal Government and for the D.C. private sector, which goal is not to be adversarial and not to make claimant's destitute-poverty stricken as the public sector devastating to our lives and our families.

I pray to my father GOD that this administration of O.R.M. b ended soon in this year, 2007 in the name of my Lord and SAVIOR JESUS CHRIST and that justice will prevail for all of the pas corruption and present corruption. Amen.

1997 to the present, I've been caught into the vicious cycle that OC.D./O.R.M. places injured workers in, but I'm fighting back with the strength of Jesus Christ, my advocate for "Equal Justice Under the Law". And "Due Process of the Law." My case should be reversed.

neurosurgeon and an Orthopedic Surgeon deemed a permanent partial and a permanent total whole body rating, case accepted June 25, 1990.  1996 Sent to I.M.E. two more I.M.E."s only orthopedic surgeon, who knew nothing about the treating physicians diagnosis, or about the previous I.M.E's diagnosis.  March 1, 1997 Benefist terminated solely based on the tow IME reports rates them the whole record.  of John William and Richard Holden two I.M.E. physician's who knew nothing about my treainting physician diagnosis.  1991 Fraudulently present by the Office of Disability Compensation and further by the Office of Risk Management.  September 1997 The Hearing Adjudication and Appeal Process under the Department of Employment Services contained omitted, altered, and

fraudulent evident which was not substantiated. The hearing Examiner requested new fresh probative evidence which he never reviewed as well as the Director, while ignoring omitted to address the I.M.E.'s permanent ratings.

D.C. GOVERNMENT

D.C. CITY COUNCIL
THE COMMITTEE ON WORKFORCE
DEVELOPMENT
AND
GOVERNMENT OPERATIONS
BUDGET HEARING
CAROL SCHWARTZ, CHAIR
MARCH 28, 2007

GOOD AFTERNOON

I GERALDINE TALLEY HOBBY, PRAY THAT THIS HONORABLE BODY WILL HEAR ALL OF OUR VOICES TODAY, AS WELL AS THOSE WHO CAN NOT BE HERE IN ORDER TO DEMAND A CHALLENGE OF THE INFFICIENCY AND IN EFFECTIVENESS OF THE D.C. DISABILITY COMPENSATION PROGRAM FOR ALL INJURED WORKERS IN THE NAME OF MY LORD AND SAVIOR JESUS CHIRST.

THERE'S GREAT CONCERN OVER THE REORGANIZATION PLAN OF 2003 WHICH WAS DESIGNED BY FORMER MAYOR ANTHONY WILLIAMS AND CITY ADMINISTRATOR ROBERT BOBB, WHICH HAS HAD DEVASTING EFFECTS ON D.C. INJURED WORKERS AND THEIR FAMILIES. THEIR SO CALLED BEST PRACTICE OF THE OFFICE OF RISK MANAGEMENT IS THE WORST EVIL PRACTICE, WHICH DEPRIVE INJURED WORKERS AND THEIR DEPENDENTS OF THEIR BENEFITS AND ENTITLEMENTS. THE PRACTICES OF ORM AND TPA ARE UNJUST AND CRUEL TREATMENT TO INJURED WORKERS WHO HAVE SERVED THE D.C. GOVERNMENT WITH DEDICATION AND COMMITTEMENT. THIS REFLECTS IN COMPENTENCE AND ABUSE OF AUTHORITY BY ORM AND THE TPA ESPECIALLY SINCE THERE WAS NO STRATEGIC PLAN FOR THE REORGANIZATION OF 2000, AS FORMER INTRIM DIRECTOR JACOBS STATED ON 03/30/03 THAT "THE OBIVOUS BEST PRACTICE IDEA OF PLACING THE CLAIMS ADMINISTRATION FUNCTIONS IN THE NEWLY FORMING OFFICE OF RISK MANAGEMENT TO SURFACE". THE BIBLE CLEARLY STATES

THAT DOES WHO MISTREAT WIDOWS, ORPHANS AND THE NEEDY SHALL BE SEVERLY PUNISHED.

THE WORKER'S DISABILITY COMPENSATION PROGRAM WAS TRANSFERRED TO ORM IN 2003 AND APPROVED BY THE CITY COUNCIL IN 2004; THIS HAS BEEN A TRAGIC MISTAKE AND A VIOLATION OF D.C. 3-177 AND THE COMPENSATION ACT WHICH DEPRIVED ORIGNALLY FROM THE U.S. DEPARTMENT OF LABOR AND MANY OF US ARE STILL COVERED UNDER THE FEDERAL GOVERNMENT STATUS. JACOBS ALSO STATED THAT THE PROGRAM WAS COMPLEX SINCE THE POLICE OFFICERS AND FIREMEN FALL UNDER ONE CATEGORY, SOME D.C. PUBLIC SECTOR EMPLOYEE'S ARE UNDER NON FEDERAL STATUS. "THERE IS ALSO A PRIVATE SECTOR EMPLOYEES COMPENSATION PROGRAM REMAINS UNDER THE DEPARTMENT OF EMPLOYEMENT SERVICES. THE LAWS AND AMENDMENTS WHICH APPLY TO ALL OF THESE EMPLOYEES NEED TO BE IDENTIFIED.

WHILE THE PUBLIC SECTOR'S COMPENSATION PROGRAM WAS TRANSFERRED TO THE D.C. OFFICE OF PERSONNEL AND THEN TO O.P.M, ALL OF WHICH CAUSED FILES TO BE LOST AND DESTROYED; WHICH REFLECTS NEGLIGANCE AND ETHICAL PRACTICES AS WELL AS IRRESPONSIBILITY TO SAY THE LEAST.

THE ORM NEEDS TO BE ABOLISHED AS STATED BY MR. ORANGE AND GOV'T OP'S OF 2004; AND EACH AGENCY SHOULD BE RESPONSIBLE FOR ITS OWN BUILDING RISK. THE D.C. OFFICE OF DISABILITY COMPENSATION PROGRAM NEEDS TO BE REMOVED FROM O.R.M. AND PLACED UNDER THE D.C. OFFICE OF PERSONNEL OR TRANSFERRED BACK TO DOES WHERE THE U.S. LABOR DEPARTMENT PLACED IT, IN 1979 WITH FEDERAL GOVERNMENT OVERSIGHT AND MONITORING, ESPECIALLY IN LIGHT OF THE RECENT INSPECTOR GENERAL'S REPORT WHICH REVEALS THAT ORM AND THE TPA USED MONEY FROM THE COMPENSATION FUND (WHICH IS ONLY FOR THE BENEFIT OF CLAIMANTS AND THEIR DEPENDENTS, AS WELL AS MEDICALS, WITH APPROPIATIONS FROM THE COUNCIL AND THE U.S. CONGRESS) FOR ADMINISTRATIVE PURPOSE WHICH VIOLATES THE CODE. ADDITIONALLY THERE ARE FEES WHICH THE TPA

DOUBLED BILLED THE DISTRICT GOVERNMENT. THIS MONEY
CAME FROM THE COMPENSATION FUND, WHICH IS
APPROPRIATED BY THE COUNCIL AND CONGRESS TO BE USED
ONLY FOR THE CLAIMANTS BENEFITS AND THERE DEPENDENTS
AS WELL AS MEDICAL. THIS FUND IS NOT STATED IN O.R.M.
ANNUAL BUDGET AND IT NEEDS TO BE INVESTIGATED FROM
IT'S INCEPTION OF 1979. THIS IS OUTRAGEOUS ORM RATHER
PAY THEM MONEY, WHILE NEGLECTING TO PAY CLAIMNTS
BENEFITS AND AWARDS. ORM AND THE TPA HAVE DEFRAUDED
THE CITIZENS AND EMPLOYEES OF THEIR VESTED PROPERTY
INTEREST IN THE CITY. FUTHER MORE THE $9.4 MILLION
CONTRACT FOR 3 YEARS FOR THE T.P.A. IS OUTRAGEOUS
ESPECIALLY; THERE IS STILL $3 MILLION DOLLAR
TAIL/MEDICAL BILLS WHICH THE CITY COUNCIL
APPROPRIATED IN      . SINCE THEIR MAIN GOAL IS TO DENY
CLAIMANTS OF THEIR BENEFITS AND FILL THEIR GREEEDY
POCKETS WHILE CLAIMAINTS GO FROM MIDDLE CLASS TO
POVERTY, THIS IS IN HUMANE AND SHOULD BE INVESTIGATED.

THESE ARE THE ISSUES IN MY CASE:
- NO STATED PURPOSE FOR THE PUBLIC SECTOR
  DISABILITY COMPENSATION PROGRAM, AS COMPARED
  TO THE PRIVATE SECTOR AND THE FEDERAL PROGRAM.
- NO EMPLOYEE HANDBOOK OF BENEFITS FOR THE PUBLIC
  SECTOR WHILE THE PRIVATE SECTOR AND THE FEDERAL
  GOV'T HAVE BOOKLETS FOR CLAIMANTS.
- EMPLOYED AS A DCPS ART TEACHER
- RECEIVED PERMANENT STATUS
- TERMINATED BY DCPS WHILE INJURED
- INJURED ON SEPT. 30, 1986 IN A WORK RELATED
  AUTOMOBILE ACCIDENT, UNDER THE U.S. DEPARTMENT
  OF LABOR, SUSTAINING MULTIPLE INJURIES/ CLAIM
  ACCPEPTED
- INJURED ON FEB. 22, 1990 IN TWO SLIP AND FALL
  ACCIDENTS UNDER D.C. GOV'T AND SUSTAINING
  MULTIPLE INJURIES OF THE SAME BODY PARTS
- TREATING PHYSICIANS DIAGNOSIS ARE HISTORICALLY
  CONSISTENT ACCURATE AND FACTURAL MEDICAL

DOCUMENTATION. TEMPORARY TOTAL EVALUATION/
PERMANENT

- I.M.E.'S IN 1990 AND 1991 STATED THAT PERMANENT
  DISABILITIES RESULTED FROM THE FEB. 22, 1990 WORK
  RELATED INJURY AND THEY GAVE ME TWO PERMANENT
  RATINGS, FOR ORTHOPEADIC REASONS AS WELL AS FOR
  NEURO/NERVE DAMAGE. NO RELEASE TO RETURN TO MY
  JOB WAS GIVEN
- RETURNED TO WORK FOLLOWING THE 45 DAY PERIOD,
  AND PERFORMED THE SAME PHYSICAL DUTIES AND
  RESPONSIBILITIES, WHICH WORSEN MY CONDITION, AND
  A RECURRENCE RESULTED
- NO MONTHLY/YEARLY BENEFITS STATEMENTS WERE
  ISSUED, AS WELL AS BEING PAID ON THE WRONG STEP
  GRADE WITH REPEATED DELAYS, AND NO COST OF
  LIVING INCREASES
- USED 44 DAYS OF LEAVE UNTIL THE END OF THE SCHOOL
  YEAR.
- ON JUNE 25, MY CLAIM WAS ACCEPTED FOR
  CONTINUATION OF BENEFITS BUT PART TIME BENEFITS
  WERE NOT ISSUES
- WITHOUT ANY JUST CAUSE REASON TO AN ORTHOPEADIC
  I.M.E. WHO WAS UNKNOWLEDGEABLE ABOUT THE
  PREVIOUS I.M.E. REPORTS, AS WELL AS THE FACTURAL
  TREATING PHYSICIANS DIAGNOSIS, BUT CITIED
  LIMITATIONS
- SENT TO ANOTHER ORTHOPEADIC I.M.E. WHO HAD NONE
  OF THE ABOVE FACTURAL INFORMATION. BOTH ONLY
  HAD A QUESTION, BUT ANY COMPTENT PHYSIANS
  WOULD HAVE ASKED MORE QUESTIONS
- BENEFITS WERE TERMINATED ON MARCH 1, 1997; BASED
  SOLY ON TWO IME REPORTS OF JOHN WILLIAMSON AND
  RICHARD HOLDEN, BOTH ORTHOPEADIC SURGEONS
  WITHOUT ANY INVESTGATION OR RECONSIDERATION
  PROCESS, AND THROUGH FRAUDULENT MEANS RATHER
  THAN FACTS. SUBSTANIAL EVIDENCE SHOULD HAVE
  SUPER SEEDED UNSUBSTANTIAL EVIDENCE, WHICH WAS

- MR. MIDDLETON WAS BIAS AND WAS IMPARTIAL AS WELL AS THE DIRECTOR RATHER THAN "FAIR" AND "JUST". THERE ARE VIOLATIONS OF DUE PROCESS OF THE LAW. A REVERSAL OF MY CLAIM/CASE IS IN ORDER.
- FEDERAL OVERSIGHT AND MONITORING IS NEEDED OVER THIS PROCESS AS WELL.
- IN CLOSING, THE JUDGES NEED TO BE SCRUTINIZED AS TO THEIR COMPETENCE AND ETHICAL PRACTICES, REMEMBER GOD IS THE FINAL JUDGE FOR US ALL, AND WE MAKE THE CHOICE OF HEAVEN OR HELL.

TO GOD BE THE GLORY,
IN GOD I TRUST!

GERALDINE TALLEY HOBBY

**Geraldine Talley Hobby**
**710 Carnoustve Lane**
**Fort Washington, MD  20744**
**(202) 528-1678 or (212) 920-5632**

30-May-2006

**RE: District of Columbia Art Teacher 1967-1990; Date of Injury:  Feb. 22, 1990**
     **District of Columbia Home Study Director 1989-1990;**
                                        **Date of Injury: Sep. 30, 1986**
          **Multiple injuries sustained in both claims are described below:**

My complaint of the District of Columbia's Office of Disability Compensation/Office of
Risk Management stems from the above referenced job injuries sustained while
employed as a District Art Teacher and a Home Study Director.

## ISSUES

There are <u>systematic violations</u> in the following areas, as they are discovered;

     <u>Abuse of authority</u>,  to terminate my disability/compensation benefits, as well as
those of other claimants.

## POLICIES

The D.C. Government's Office of Disability Compensation/Risk Management has
devised a plan to eliminate claimant's from the benefits payroll, rater than exercising
sound judgment by the administration of the law and justice, in handling my case, as well
as the cases of other employees, who have given years of dedicated and committed
service to this great city of Washington, D.C., the Nation's Capitol and an example to the
whole country and the World (under D.C. and Federal Law. "Justice is rarely served but
the table is turning."

## PROCEDURES

The D.C. Government's Office of Disability Compensation/Risk Management has
<u>violated procedures</u> in my particular, case as well as the cases of other claimants.
<u>Procedural steps</u> have been <u>omitted/skipped</u> and there by the result has been a violation of
my <u>rights</u> and <u>others.</u>

     (1) I <u>suffered multiple injuries</u> which were accepted in the initial diagnosis; and all
subsequent treating physician reports for  seven (7) years and their reports were never
questioned, or had an opportunity to do so. Furthermore, the "<u>Federal Treating physician</u>
<u>Preference Rule</u>" was not applied.  Additionally, two Independent Medical Evaluator,
herein known as IME, gave me an American Medical <u>whole body permanent ratings</u> of
eight (8) percent orthopedic and fifteen (15) percent neurological in 1990 and 1991.
Seven (7) years later, I was sent to two <u>other IME's</u> who knew nothing about the IME
reports even the <u>treating physician's diagnosis</u>, or my <u>physical job description</u> of an Art
Teacher as Office of Disability (Office of Risk Management) <u>failed to see the whole</u>

Geraldine Talley Hobby
Office of Disability Compensation/Office of Risk Management
30-May-2006
Page Two

medical history and no questions were asked but hasty reports were written.

(2) Reinstatement of retirement benefits for seven (7) years were not calculated or made payable to me. Following the 45 days of trauma, I returned to work and could not perform my physical duties and responsibilities. I was assigned play ground duty upon returning to work and whenever I was scheduled appointments or needed to see the doctor, I was required to use my personal and sick leave to accommodate an approved job injury.

(3) After returning to work, I was subjected to a reoccurrence which was not addressed by the Office of Disability Compensation/Office of Risk Management and not considered by the IME.

(4) My job and my retention rights to the D.C. Public School system was terminated and abolished while on last IME reported that I had physical limitations and needed to be rehabilitated. Another IME reported I could return to full duty work in :       : 1997, although my treating physician diagnosed I was permanent/and totally disable from work, as well as the social

## PRACTICES

The D.C. Government's Office of Disability Compensation/Risk Management's "BEST PRACTICE" has been the "WORST PRACTICE" for employees, who are injured on the job or suffer occupational diseases. It has been a "NIGHTMARE" rather than "A DREAM" that an employee can depend on, if injured. My life and my family's life has been devastated by and at the hands of ruthless and treacherous workers of iniquity. Where is the excellence and quality of disability compensation care? Not here! Why aren't the laws and rights of D.C. Government worker's out lined in a Worker's Compensation Act, which many of us fall under and some fall under the District of Columbia Government; and as the District of Columbia Government has outlined in the D.C. Worker's Compensation Act of 1979 (as amended) D.C. Law 3-77 for the private sector?  Who protects our right's and privileges?

## PROCESS

The D.C. Government Office of Disability Compensation/Risk Management has continuously denied "DUE PROCESS OF THE LAW" in many cases, and mine is one. "EQUAL PROTECTION OF THE LAW" is another issue for myself and others.

The hearing was "not fair and just", but a set up, to further terminate my benefit; (1) an omission of the 1986 work-related injury; (2) an omission of the 1990 whole medical

Geraldine Tally Hobby
Office of Disability Compensation/Office of Risk Management
30-May-06
Page Three

case file /record; (3) treating physician diagnosis altered and omitted; (4) an outdated incorrect 1960 job description, an Art coordinator not an Art teacher was used; (5) permanent whole body ratings from the IME's were omitted and stated as too remote to be probative by the hearing examiner; (6) the new fresh probative evidence was not reviewed by the hearing examiner and by the Director; (7) a refusal to reconsider my claim twice and also to rehear my case; (8) at my pre-hearing conference no documentation could be located or found; (9) it took eight (8) months before my case was heard; (10) It over six (6) months before I received a decision; (11) my benefits were terminated and based solely on two IME's medical opinions after two previous IME's gave an American Medical Disability ratings; (12) I was defrauded by the government. I was defrauded out of my "vested rights" and I feel the District government conspired against me by not addressing the weight of their IME whole body ratings or my treating physician's diagnosis. I have been deprived "EQUAL PROTECTION" of the law by the government which has left me "homeless but not hopeless;" (13) Failure to review the Whole Body Permanent rating to give it the substantial weight that it deserves; (14) Failure to state a reoccurrence in the record as an aggravation; (15) Concealed the evidence of the Federal Government's Social Security Administration's Award of a Permanent Disability rating as to the February 22, 1990 work related injury, which was sent directly to them; (16) ODC omitted a statement of an aggravation to the degenerated disc; (17) ODC omitted the herniated disc etc. as diagnosed by the treating physician, John Galeno in the hearing and to the IME's Williamson and Holden, who didn't address the treating physician's diagnosis; (18) ODC omitted the nerve damage of treating physican, Earl Mills in the hearing and to the above IME's and the treating physicians diagnosis was not addressed by them; (19) Mutiple-work related disabilities as a result of the 1990 injury was not stated at the hearing or recognized by the IME's Williamson and Holden; (20) A failure to view the disability compensation records as a whole (1986 and 1990) where there was substantial evidence in the record; (21) Wage stacking was inaccurate and needs to be verified as disbursed; (22) Benefits were paid in the wrong pay scale for 7 years, and no benefits statement; (23) No Cost-of-Living Adjustment (COLA) increases for 7 years and; (24) Refusal to reopen a hearing (25) No benefits pay stub for 7 years (26) Travel reimbursement is still due.

### "MY REQUEST"

Therefore, the IME reports of Williamson and Holden which were used in to terminate the claimant's benefits and used in the judiciary hearsay (review) were not of substantial weight because they didn't have all of the treating physician's medical evidence, etc,, and the 1990 and 1991 IME reports of Levitt's and Hortwitz; Additionally, the Hearing Examiner and Director held fraudulent, erroneous and unsubstantiated hearings, which did not include all of the above as evidence (newly discovered). The Order should be

Geraldine T. Hobby
Office of Disability Compensation/Office of Risk Management
30-May-2006
Page Four

reversed!

D.C. Government and its administrative procedures and in the judicial review process of the following agencies and courts who have not reached the "Merits" of the case:  D.C. Public Schools;  The Office of Disability Compensation;  The Office of Hearings Appeals and Adjudication; The D.C. Department of Employment Services; The D.C. Superior Court and the D.C. Court of Appeals; which adds up.

Consequently, my family and I have suffered "cruel in humane, and treacherous treatment", as have other employees and their families.  These ruthless tactics have caused estrangement, as well.  I feel I have not been treated fairly as well as many other employees under the Merit Personnel Protection Act, The Worker's Compensation Act, the U.S. Labor Code, and the Federal Employees Compensation Act, etc.  This must stop NOW!  Under Constitutional law, my life, liberty, pursuit of happiness, and property have been violated.  The merits of my case have never been heard  I am physically emotionally and financially devastated, due to the lost of two (2) pieces of real property.

There's a conspiracy to deny the claimant's rights and obstruct them.  This administrative abuse of authority shows gross negligence.  Again, the REVERSE SET ASIDE OF THE Hearing Examiner's Decision/Order, s well as the Director of Employment's Service's ruling because it is arbitrary, capricious, and an abuse of discretion and not in accordance with the law.

In conclusion, forthwith, I pray to Jesus Christ my advocate because I feel I have been abandoned by the D.C. Government after we have worked heard to serve the city and it's citizens.  TO GOD be the Glory, In GOD, I Trust.

Thank you,


Geraldine Tally Hobby

Attachments

Testimony: Geraldine Talley-Hobby

DOES Budget, April 08, 2005

# NEED TO SECURE ADDITIONAL SKILLED ADMINSTRATIVE LAW JUDGE'S

On September 30,1986, I was injured while performing my duties as an Art Teacher. There was a further injury occurring February 22, 1990. This caused the inability to perform my regular required daily physical duties. The latter injury occurred while performing part-time work as a D.C. Government Home Study Director and were initially accepted for sprain/strain and after a more extensive diagnosis by the treating physicians (Orthopedic Surgery). I was placed on the permanent roll from 1990 thru 1997. November 11, 1996, a medical doctor made referral for Independent Medical Evaluation by a non-Orthopedic physician.

On 03/01/97, I was terminated from the roll due to conflicting evaluations. Documentation provided to agency IME was missing information and provided the wrong diagnosis. DOES provided incomplete case files, i.e. out-dated position description identifying the work as sedentary, missing neurosurgcal report, provision of "JUST" weight to treating physician report. Medical elements provided via medical reports was missing information, e.g., report was not addressed chronic back pain syndrome, right lower extremity radiculopathy, hypertrophied ligament, lumbar spinal stenos is, herniated disc, bilateral knee syndrome numbness and degenerative facet disease. The conditions created by the work causal injuries resulted in a Social Security Rating rendered August 14, 1996 identifying the work related injury of February 22, 1990 as the cause of disability. There is a need to not only require penalties for case file mismanagement but the manner in which the hearings are conducted, the nature and amount omission of evidence, concealment, and deception. An undated Opinion and Order was written prior to date of case review. ECAB had been abolished prior to the undated document. A Remand Order was written but I was directed to by DOES staff the wrong court.

For God's sake, I was a Teacher providing a creative outlook for District children; instead of being applauded I was lulled into addressing this case in the wrong jurisdiction purposely. My tenured job of over twenty years was terminated without my knowledge, while on the Worker Compensation permanent roll. No notification or information as to what was occurring. I was thrown away after the acceptance of Social Security, losing my health care and life insurance after twenty years!!! I am still entitled to return to the Worker Compensation Roll post haste.

## HOW COULD THIS HAVE OCCURRED AND WHAT ARE YOU GOING TO DO TO CORRECT AGENCY ERROR?

## HOW CAN YOU ENSURE THIS COMEDY OF ERRORS NEVER OCCURRED AGAIN?

D.C. CITY COUNCIL
OVERSIGHT HEARING FOR D.O.E.S
HEARING, ADJUDICATIONS AND APPEALS

GOOD AFERTNOON

CAROL SCHWARTZ CHAIR
March 28, 2007


MY NAME IS <u>GERALDINE TALLEY HOBBY</u>,

THIS IS AN OVERVIEW OF THE ISSUES IN MY CLAIM/CASE,
WHICH NEED TO BE ADDRESSED.

- A FRADULENT/ERRONEOUS HEARING WAS HELD IN WHICH
  UNSUBSTANTIATED EVIDENCE WAS USED BY TWO
  ORTHOPEADIC I.M.E.'S WHO WERE NOT KNOWLEDGEABLE
  ABOUT MY WORK RELATED INJURIES OF 1986 OR 1990, AS
  WELL AS THE FOLLOWING:  NO RECONSIDERATION
  PROCESS WAS GIVEN AND BENEFITS WERE ABRUPTLY
  TERMINATED.

  1. NO PREHEARING WITH DOCUMENTTAION WAS HELD.
  2. MY JOB DESCRIPITON AS AN ART TEACHER, WHICH
     WAS PHYSICAL.
  3. THE TREATING PHYSICIANS DIANOSIS, WHICH THE
     I.M.E.'S NEVER STATED.
  4. THE PREVIOUS I.M.E. REPORTS, STATING PERMANENT
     INJURIES.
  5. THE 1986 WORK-RALTED EVIDENCE/FACTS WAS NOT
     PRESENTED.
  6. THE WHOLE MEDICAL RECORD/FILE WAS NOT
     REVIEWED.
  7. NEW FRESH PROBATIVE EVIDENCE WAS NOT
     REVIEWED BY THE HEARING EXAMINER OR BY THE
     DIRECTOR BUT IGNORED.
  8. EVIDENCE WAS ALTERED, INTETIONALLY.
  9. DELAYED THE HEARING AND THE RESULTS.

10. FALSE STATEMENTS WERE PRESENTED UNETHICALLY BY THE CITY ATTORNEY AND I WAS NOT ALLOWED EQUAL PROTECTION OF THE LAW AS WELL AS EQUAL JUSTICE UNDER LAW.

11. AN OBSTRUCTION OF JUSTICE HAS RESULTED, AS WELL AS A DEPRIVATION OF "LIFE, LIBERTY AND THE PURSUIT OF HAPPINESS".

12. MY SUBSANTIAL EVIDENCE, THE WHOLE FILE/RECORD RAISES SUBSANTIAL QUESTIONS. IN ADDITION TO THAT I WAS NOT GIVEN THE OPPORTUNITY FOR A NEW HEARING.

13. AN OUT DATED JOB DESCRPITION OF AN ART CONSULTANT, 1960 WAS USED RATHER THAN ART TEACHERS

14. A RETROACTIVE AWARD OF MY PART-TIME BENEFITS WAS NOT PAYED WHICH WAS IN THE EXCESS OF OVER 100,000 DOLLARS IS UNDER INVESTIGATION.

15. NO REVIEW OF MY CASE AND OBSTRUCTION OF A REVIEW.

- IT HAS BEEN STATED THAT HEARING EXAMINER/ADMINISTRATIVE LAW <u>JUDGE ROBERT MIDDLETON</u> WAS NOT A LICENSED JUDGE, OR EVEN COMPETENT IN THE AREA OF COMPENSATION LAW, AS WELL AS SOME OTHERS.

- MR. MIDDLETON WAS BIAS AND WAS IMPARTIAL AS WELL AS THE DIRECTOR RATHER THAN "FAIR" AND "JUST". THERE ARE VIOLATIONS OF DUE PROCESS OF THE LAW. A REVERSAL OF MY CLAIM/CASE IS IN ORDER.

- FEDERAL OVERSIGHT AND MONITORING IS NEEDED OVER THIS PROCESS AS WELL.

- IN CLOSING, THE JUDGES NEED TO BE SCRUTINIZED AS TO THEIR COMPETENCE AND ETHICAL PRACTICES, REMEMBER GOD IS THE FINAL JUDGE FOR US ALL, AND WE MAKE THE CHOICE OF HEAVEN OR HELL.

ADDENDUM

16. A Re-hearing was denied

17. Violations of the Hearing, Adjudication and appeal process

TO GOD BE THE GLORY,
IN GOD I TRUST!

# D.C. CITY COUNCIL OVERSIGHT COMMITTEE
## CHAIRMAN, VINCENT GRAY
### APRIL 5, 2007

*EDUCATION*

### GOOD MORNING

My name is Geraldine Talley Hobby, an abandoned D.C. Public School (DCPS) Art Teacher, who was injured. I worked for over 31 years (of Service), with seven years of receiving disability compensation benefits. While receiving disability Compensation benefits, I was paid on the wrong grade and step, as well as not receiving any COLAs for the duration. This needs to be corrected.I served with dedication and commitment, as well as receiving outstanding and excellent ratings. The U.S. Department of Education, as well as the District of Columbia, issued me awards. I was hired under the U. S. Department of Labor with civil service status. There are violations of the Merit System Protection Act in my case.

A nightmare began when I was injured, and the bottom line is that DCPS is fully responsible, as well as the D.C. Office of Risk Management, who now administers the Disability Compensation Program along with Third Party Administrator. In 2002, prior to the Reorganization Plan of 2003, which was devised unlawfully and put into operation by the former Mayor Anthony Williams and City Administrator Robert Bobb. This plan was incompetently drawn up without a concise and strategic plan and approved by the City Council on December 15, 2004.

The Compensation Fund has also been misappropriated, which is supposed to be used only for the claimant's benefits, not for administrative purposes. As a result o he cruel and unjust treatment by DCPS and the Office of Disability Compensation (ORAM & TPA), my sons and I have suffered irreparable harm.

I am due an award in the excess of over $100,000. A former hearing examiner, Robert R. Middleton, stated erroneously that $57,599.32, was compensated on May 17, 1998, for wage stacking of my part time position from June 25, 1990 to March 1, 1997, without investigating or verification of program for years. The ODCP has been a broken program for years and needs to be fixed urgently.

My employment with DCPS was terminated fraudulently, as well as my disability compensation benefits. Both should be reversed. The merit of the case has never been reached, as well a the substantial evidence received. This raises a substantial question of Law.

The Disability Compensation Program needs to be removed from ORM and the TPA. The program needs to be placed back with the Office of Personnel Management or with the Department of Employment Services, with Federal oversight monitoring (receivership).

Additionally, the Washington Teacher's Union, has abandoned me after paying dues for years and never needing their previous help.

In regards to DCPS, history stands for itself. The system has been and is a mess that needs to be fixed. As educators, we can't create brains, but we can develop minds. Black University's MOTTO is "A Mind Is A Terrible Thing To Waste!!" DCPS has and continues to fall short. Help is needed. The Mayor as well as the City Council should take over the DCPS. At this time this is the best solution. I pray that education will go up and crime will go down.

Geraldine Talley Hobby

*Geraldine Talley Hobby*

*To GOD be the Glory!*

*In GOD I Trust!*

# DISTRICT OF COLUMBIA CITY COUNCIL COMMITTEE
# ON
# WORKFORCE DEVELOPMENT
# AND
# OVESIGHT

### JUNE 11, 2007
### HONORABLE CAROL SCHWARTZ, CHAIR

## A RESPONSE TO THE AUDIT OF THE THIRD PARTY ADMINISTRATOR'S SUBCONTRACTOR COSTS FOR THE DISTRICT OF COLUMBIA EMPLOYEE'S DISABIITY COMPENSATION PROGRAM (WHERE IS THE AUDIT OF THE DISTRICT OF COLUMBIA OFFICE OF RISK MANAGEMENT, THE COMPENSATIN FUND, THE GENERAL FUND AND THE ADMINISTRATION FUND?)

## A RESPONSE TO THE
## DISTRICT OF COLUMBIA DISABILITY COMPENSATION PROGRAM

### CHARLES J. WILLOUGHBY, INSPECTOR GENERAL
### "WHY PRIVATILIZATION MUST END!"

### SUBMITTED BY
### THE DISTRICT OF COLUMBIA INJURED WORKERS COMMITTEE

**GERALDINE TALLEY HOBBY**
301.254.1409

**JANICE DUNBAR**
202.361.1602

**CHARLENE MORGAN**
202.678.1157

P.O. BOX 441972
FORT WASHINGTON, MD  20749-1972

GOOD AFTERNOON

BEFORE I BEGIN, I MUST SAY TO **GOD** BE THE GLORY!
AND IN **GOD** I TRUST!

I **Pray** to **GOD, MY HEAVENLY FATHER**
That as I walk in **FAITH,** that the issue involving ORM, ODC,
the TPA, OHA, CRB,  as well as the employing
agencies will be resolved.

In **JESUS CHRIST NAME**


My name is Geraldine Talley Hobby, an injured D.C. Public School Art Teacher
and Home Study Director, who had 26 years, 7 months of service, and almost
seven years of disability compensation benefits, when both my employment and
my benefits were terminated fraudulently/illegally, which violated both state and
federal laws under the United States Merit System and the U.S. Justice
Department, etc.  All of this has devastated me, as well as my family.

The following violations occurred: (1) no investigation; (2) no reconsideration; (3)
no review; (4) no valid pre-hearing; (5) no fair, just and impartial hearing.
Note:  The Treating Physicians never questioned about their diagnosis.

**2**

# EXECUTIVE SUMMARY

## OVERVIEW

The <u>audit</u> was <u>initiated</u> <u>due</u> <u>to</u> <u>complaints</u> <u>alleging</u> <u>inappropriate</u> <u>management</u> <u>practices</u> by <u>ORM</u> and <u>TPA</u> of the <u>Disability</u> <u>Compensation</u> <u>Program</u>.

Let me state that the following exist:
    (1) a <u>lack of competence</u> in the administration and management of the program, even to the Hearing, Adjudication and Appeal levels;
    (2) <u>in humane tactics</u> are used by the above parties, who are <u>arrogant, rude, insensitive and ruthless;</u>
    (3) <u>unjust, bias and partiality</u> is exhibited at all levels, which distort the purpose of the program, as well as its integrity and fairness;
    (4) <u>no stated purpose or mission statement for the Disability Compensation Program;</u>
    (5) <u>no handbook of rights and laws,</u> as the private sector ad the federal government has both of the above.

## IG

"The <u>overall objective</u> was to <u>determine whether rules published</u> by the <u>District</u> <u>concerning</u> the <u>termination, suspension and resolution of disability compensation</u> <u>benefits</u> for District employees were <u>followed</u>."

The <u>Private Sector Compensation Program</u> that is still under <u>DOES</u> has a <u>book</u> entitled
    • The D.C. Workers Compensation Act of 1979 (as amended)

The Federal Government has a book which is entitled
    (1) The Office of Worker's Compensation Programs, OWCP, Injury Compensation for Federal Employees, and
    (2) Federal Employees Compensation Act, FECA, Questions and Answers

What book does the D.C. Government have for the public sector Disability Compensation Program?

3

## IG

"The specific objective for the audit was to determine whether the TPA complied with the terms of the TPA contract."

## BACKGROUND

First, the concerns relating to the termination, suspension and the reduction of disability compensation benefits for District employees are vague and have been changed from the original code, D.C. Law 3-177, 1979, and the Compensation Act, which was transferred to DOES from the U.S. Labor Department. Many changes are in violation of the Merit Personnel Act of 1978 (also in violation of employees rights, especially those with Civil Service status.)

Since the transfer of the program, it has been administered and managed incompletely, which has had a disasterous effect on the lives of injured workers. In fact, working for the D.C. Government is a risk. The employees/injured worker, isn't a risk, but working for the D.C.Government has become a risk for us. Furthermore, the entire process is not suppose to be adversarial, but it is just that.

## ADMINISTRATION OF THE PROGRAM

Additionally, **The Reorganization Plan of 2003**, "which was placed the Disability Compensation Program Subordinate to ORM was approved by the City Council on December 15, 2004, but the program was transferred in 2002. The program was under the D.C. Office of Personnel from October, 2001 – July, 2002. DOES administered the program prior to that date. It should have remained under..... DOES or within Personnel. It's further stated by ORM that files/records were lost and perhaps some were destroyed. By law, a compensation case is never closed.

Former Mayor Anthony Williams and City Administrator, Robert Bobb, made a detrimental mistake in devising the Reorganization Plan along with the Attorney General's office assistance. The Attorney General's Office is also notified former

4

Interim Chief of ORM, James Jacobs, on December 5, 2002, from the D.C.
Employee's Compensation Fund to Pay the Costs of Third Party Administration
Contracts. We are in 2007 and history is still repeating itself.

## THE DISABILITY COMPENSATION PROGRAM

It was stated that a previous audit (1999) was performed on D.O.E.S. WHEN THE
Disability Compensation Program was administered there.

## RESPONSE TO CONCLUSIONS

But, it is not clear why routine audits have not been done  for such a troubled
program. Additionally, there has been fraud on the part of the D.C. Government
workers within the program who embezzled money, and now with more
sophistication, the TPA and the subcontractor with the backing of ORM, greed has
gone beyond the $9.4 million contract ($9,438,987.00) for three years, into over $3
million for a year. A further audit needs to be done historically.

## DISABILITY COMPENSATION FUND

Further audits need to be done on the Compensation Fund which D.C. Law 3-177
(Compensation Act) establishes this fund for benefit of the claimant and their
dependents, also medicals.

Separate audits of the Administration Fund.

The Special Fund needs to be audited as well.

5

## THE COMPENSATION FUND IS NOT FREE MONEY FOR ORM AND THE TPA

* All funds which have gone into the program need to be audited.

Furthermore, the cost of five full-time employees assigned to administer the Disability Compensation Program and cost of the TPA contract should not be deducted from the Compensation Fund, but should be in a separate Administrative Budget, Congress didn't plan.

The allowable cost and double billing is illegal. These funds belong to the Compensation Fund, hence the injured workers.

ORM and the TPA are playing a **GAME** of **MONOPOLY** with the injured workers lives, and it has been devastating to our lives and to our families, when is this going to STOP? Not until it is FORCED to.

Additionally, there is another side to the coin. The side of governmental waste, fraud, corruption and abuse. May I add injustice and conspiracy to eliminate claimants from the roll without just cause. This needs to be audited, as requested! When people are more concerned about money than the welfare of employees, there's a major problem.

In regards to the random audit search of 92 claimants, it is amazing that the search found claimants who had retired on _____ working, _____ receiving compensation benefits (but!)

The search should have and should be broader to search for claimants who state that their benefits were terminated, suspended or reduced, without just cause, and they have facts, substantial evidence to prove it, subsequently substantial questions arise. The whole picture of the audit must be seen. Not profiles of the same kind The whole spectrum and picture must be viewed, in order to have an accurate audit, which should show a history of claims, in order to reflect the white picture.

6

<u>Why</u> is the <u>D.C. Compensation Program</u> contrasted to a <u>maze of confusion</u>?

It is time for the <u>Federal Government to step in</u>, so that this <u>mess can be fixed.</u>
<u>We've gone through the Williams Administration.  Mayor Fenty and the D.C. City</u>
<u>Council must step up to the plate in order to make a difference and the change</u>
<u>history</u>!

<u>Addendum</u>:

1) A record of the <u>$300 million</u> dollars for tail bills (medicals), still hasn't been
accounted for, which the <u>City Council allocated to ORM/TPA</u> last year.
Why?

2) A <u>record</u> of <u>all travel</u> and <u>additional expenses</u> was also <u>requested of ORM</u>.
<u>Where is that audit?</u>  <u>Which fund</u> were the funds <u>placed into</u>?

In closing, "Remember when you are a public servant you are just that, a
servant of the people, not of yourselves and not for the government itself and by
itself.  That's why the private sector should not have authority over disability
compensation cases.  These are two separate entities.  Choose which one you
want to serve, and remember at the end of the road, we all have to answer to
GOD or to the devil (the adversary).



Meeting not former

Mayor Anthony Williams

*Meeting Briefing*
*This form should be completed and returned to Erik Linden (erik.linden@dc.gov) AND*
*Therman Evans (therman.evans@dc.gov) by the time designated in the email.*

## MAYOR ANTHONY A. WILLIAMS
### MEETING WITH D.C. Employment Justice Center

**DATE:**          August 3, 2005
**TIME:**          2pm
**LOCATION:** Executive Office of the Mayor
**MEETING CONTACT:** *Should include the name, office and cell phone number for the*
*meeting point of contact.*
          Amy Vruno, 202-828-9675 ext 18, 202-744-2302 (cell phone)

**I.     PURPOSE:**
*Who requested this meeting?  What is the general purpose or goal?*
The Injured Worker Advocates requested the meeting.  The Injured Worker
Advocates is an organization of injured D.C. government workers and their allies who
work along with the D.C. Employment Justice Center to ensure that:
-workplace injury no longer means poverty,
-workers are given medical treatment for their work related injuries, and
-injured workers are given reemployment opportunities that are medically
appropriate.

The general purpose of the meeting is to ask that that the Mayor foster more
compliance with the law at the Office of Risk Management, and the Department of
Employment Services the agencies that administer the Disability Compensation
Program.

**II.     MEETING PARTICIPANTS/ATTENDEES:**

     Shirley Massy, Injured Worker Advocate  (speaker)
     Don Saunders, Injured Worker Advocate  (speaker)
     Constance Ware, Injured Worker Advocate  (speaker)
     Amy Vruno, attorney/ organizer at the D.C. Employment Justice Center (EJC)
(information resource)
     Mimi Garcia, organizer at the D.C. EJC (information resource)
     Thyra Griffin, Injured Worker Advocate
     Edna McManus, Injured Worker Advocate
     Gabriel Ejide, Injured Worker Advocate
     Valerie Coe, Injured Worker Advocate
     Geraldine Hobby, Injured Worker Advocate
     Robert Grimes, Injured Worker Advocate
     Sandra Mitchiner, Injured Worker Advocate
     Gaynel Nixon, Injured Worker Advocate

### B. Discussion of rocky parts of the relationship
### 1. $4 million for medical bills

We had some difficulty getting the Office of Risk Management to give us information about which medical providers were paid out of the $4 million. Finally the ORM gave us spread sheets that purported to be providers (treating physicians) that were paid out of the $4 Million allocated to pay unpaid medical bills. We fear this information given to us by ORM is inaccurate. We have heard from some providers that the money promised to them was never paid. Some providers confirmed that the amount indicated as paid on our documents was never paid. Additionally, many of the providers listed appeared to be entities other than treating doctors (such as independent medical doctors, etc). Will you ensure that the outstanding medical bills actually get paid?

### 2. Executive position on IWA legislative proposals

-Executive publicly testified against aspects the Injured Employee Protection Act without first consulting with the Injured Worker Advocates or unions.

-Regulations published June 10th appear to be an affront the intent of the Disability Compensation Program Effective Administration Act that became law in April 2005.

## III.    Improvements we want. We want simple compliance with the law. We will measure success by:

### A. Compliance with law in cases of workers who have testified and actively sought remedy about problems they have faced. Will you go through these cases and check to make sure that the law is being complied with? We have a checklist you can use to ensure that various aspects of the law were complied with (see attached checklist). Will you do this and make any remedial changes that need to be made within 60 days? Will you use this checklist to examine files to make sure that all workers are getting what they are legally entitled?

### B. Funding and support of the Injured Employee Protection Act
Will you support the Act to facilitate its passage by December 2005? Will you ensure that the act is funded this year out of the Disability Compensation or some other fund?

### C. Re-writing regulations published June 10th so that they comply with the constitution, the Disability Compensation Program effective administration act, etc.
We have submitted comments – we are willing to negotiate with you on specific language. Will you rewrite the regulations? Will you give a point-by-point response to the comments on the regulations submitted by EJC, IWA, and *Lightfoot* counsel?

### D. Will you resolve the backlog of requests for reconsideration within 60 days?

ß. D.

Committee of the Whole
Chairman Vincent C. Gray
Council Chamber (Room 500)

Testimony
Nathan A. Saunders,
General Vice President, Washington Teachers' Union
April 5, 2007

Councilmember Gray, Members of the Council, Colleagues and members of the public, I am Nathan A. Saunders, General Vice President of the Washington Teachers' Union. My testimony will be restricted to the District of Columbia Public Schools budget and I take a non traditional approach. Upon analyzing the budget, it is apparent the manner in which we address the financial responsibility of public education is problematic in and of itself. It appears the budgets are built in a fashion based on the CFO's budget mark and then we try to put everything possible within that amount, and when we can not, suddenly we declare the Mayor, CFO, or some combination has not provided enough funds for public education. Therefore the only possible conclusion is that the Mayor and CFO are not singularly or jointly not committed to public schools or children. It goes without saying, my members are prompted to call the union because it becomes apparent that teachers are going to be fired due to the budgetary shortfall or that teachers can not be hired for the upcoming school year. This budget must be built by DCPS n a fashion whereby The Board and the Superintendent are explaining the true cost of educating the children in the District of Columbia as opposed to the manner it is currently constructed.

Now that we have weighed in on the larger issue, it is important we reference some priority matters which will impact the teaching and learning equation for this budget period. Matters that do not appear to be addressed in a fashion that the average citizen is able to discern. The Washington Teachers' Union is concerned about the potential $10 million dollar liability which will tax the pension system. The Council might ask what is this? Essentially, employees of the District of Columbia Public School System who, upon their hiring, were placed in the wrong retirement system. These are teachers, administrators, custodians, and teachers aides who have been miscoded upon being employed at DCPS. Miscoding means they are either placed in the wrong retirement plan, thereby paying too much or to little, or receive no retirement contribution from their check or from the employer. This coding mishap occurs in the DCPS Office of Human resources. This has been happening for years. Please see the attached spreadsheet.

I can not explain the anger that employees have upon learning that retirement contributions have not been deducted or made on their behalf. They are further infuriated when they find out that they now have to make large payments to the retirement plan in order to make up their contributions and that this money has failed to collect interest which would have otherwise been compounded. This is the $10 million dollars which I am concerned about which, to our knowledge, has not been set aside.

It goes without saying, this issue must be addressed in this budget. Hard questions must be asked about who the individuals are that continue to make mistakes

year after year in DCPS causing the District government millions of dollars and what is their level of training. What mechanisms have been put into place to insure this problem does not continue to happen? This management error has a demoralizing impact on the workforce and it is completely avoidable.

Additionally, it is imperative the DCPS clearly earmark Pilot school Initiatives, Mentor Induction Program, $100 Teacher Startup supplies, $4,000 for the National Board Certified Teachers payment, Career Ladder funding, Tuition reimbursement, and Dual Certification.

Does this budget include funding for every public school to have a Music teacher, Art Teacher, Librarian, and School Counselor? If so, where? If not, why not?

Thank you for the opportunity to testify on this important issue.

**DC Public School System**
**Summary of Operational Failures**

As of February 14, 2007 (includes prior master list of 411 corrections).

| EFI Failure Code | Currently in CAPPS as | Should be in | Number Affected | Correction for Teachers' Plan Employer Cost | Correction for Individual Employee Contributions |
|---|---|---|---|---|---|
| 1 | Teachers' Plan | Defined Contribution | 27 | Remove from valuation | <to be determined> |
| 2 | Teachers' Plan | Unknown | 7 | Need more information | " |
| 3 | No Plan[1] | Defined Contribution | 68 | None | " |
| 4 | No Plan[1] | Teachers' Plan | 144 | Add to valuation if not already valued | " |
| 5 | No Plan[1] | CSRS | 4 | None | " |
| 6 | Defined Contribution | Teachers' Plan | 69 | Add to valuation if not already valued | " |
| 7 | Defined Contribution | CSRS | 3 | None | " |
| 8 | CSRS | Teachers' Plan | 4 | Add to valuation | " |
| 9 | Teachers' Plan w/7% Contribution | Teachers' Plan w/8% Contribution | 19 | Adjust valuation liabilities as needed | " |
| 10 | Teachers' Plan w/8% Contribution | Teachers' Plan w/7% Contribution | 95 | Adjust valuation liabilities as needed | " |
| ? | In Teachers' Plan (correction unknown) | | 78 | Add to valuation or adjust as needed | |
| ? | Not in Teachers' Plan (correction unknown) | | 60 | Remove from valuation if necessary | |
| | **Total Number Affected** | | **578** | | |

Notes:
- The numbers above may need to be adjusted for errors in "name lookup", etc.
- There could be additional members who were temporarily miscoded.
- Many of the above are terminated (at least 80, according to HR comments).
- Correct plan based on CBU code and HR comments
- There could be more inactive participants with prior errors.

Next Steps:
- **Communication to affected participants**
- Determine unknown corrections
- Adjust counts based on SSN lookup
- Collect pay history for all affected
- Estimate individual contribution corrections, and determine how to reconcile
- Determine handling of special cases (at least 3)
- CAPPS Database corrections
- Adjust actuarial valuation (Fiscal 2008 Contribution Amount)

---

[1] There is a code for "No Plan" (K), and there are also many with no entry in the Retirement Code field.

**DC Public School System**
**Operational Failures in CAPPS Database**

There are ten types of operational failures[1] that have been identified as of February 9, 2007. They are as follows:

| Current Plan in CAPPS (as of 1/7/07) | Should be in | Number Affected | Correction for Teachers' Plan Employer Cost | Correction for Individual Employee Contributions |
|---|---|---|---|---|
| Teachers' Plan | Defined Contribution | 27 | Remove from valuation | |
| Teachers' Plan | Unknown | 7 | Need more information | |
| No Plan[2] | Defined Contribution | 23 | None | |
| No Plan[2] | Teachers' Plan | 36 | Add to valuation[3] | |
| No Plan[2] | CSRS | 4 | None | |
| Defined Contribution | Teachers' Plan | 45 | Add to valuation | |
| Defined Contribution | CSRS | 3 | None | |
| CSRS | Teachers' Plan | 4 | Add to valuation | |
| Teachers' Plan w/7% Contribution | Teachers' Plan w/8% Contribution | 19 | Adjust valuation liabilities as needed | |
| Teachers' Plan w/8% Contribution | Teachers' Plan w/7% Contribution | 95 | Adjust valuation liabilities as needed | |

Further actions needed to fully correct the above:

1. Manually correct records in CAPPS system. Documentation of database corrections needs to be carefully maintained in order to determine individual corrections.
2. Ensure procedure is in place to diminish the possibility of future errors of similar nature. This also involves reviewing of data collection procedures for actuarial valuation.
3. Develop and send communications to affected employees.
4. Determine handling of individual contribution accounts (need individual salary histories from date of hire for each person affected).
5. Determine which inactive members are affected (terminated or retired).

The total actuarial impact will be the sum of the change in net employer costs, plus any additional contributions to make up for past employee contributions that were either incorrect or missing.

---

[1] There are also nine records identified as "already corrected" who were moved to the DB plan (pre-correction plan unknown). Additionally, there are several potential "special cases" that need to be looked at individually.

[2] There is a code for "No Plan" (K), and there are also many with nothing in the Retirement Code field.

[3] An additional 131 employees were added to the 10/1/06 valuation based on discrepancies in the DCPS data versus the EFI database. It is yet to be determined if these were prior corrections done in 2006.



**COUNCIL OF THE DISTRICT OF COLUMBIA**

**WASHINGTON, D.C. 20004**

September 21, 2007

Geraldine Hobby
P.O. Box 441972
Fort Washington, MD 20749

Dear Ms. Hobby:

You contacted Councilmember Mendelson's office requesting information regarding a compensation check for 57,599.32 for stacked wages from June 25, 1990 through March 1, 1997 that you have not received.

I contacted Kelly Valentine, Director of the D.C. Office of Risk Management (DCORM). She confirmed that DCORM is conducting an investigation of the distribution and payment of this check. The investigation includes tracking the check through the DC Office of Treasury and local banking institutions. To maintain the integrity of the investigation, some information will not be made available until the completion of the investigation. She also confirmed that she is in regular contact with you regarding this matter.

It may be helpful to you to retain legal counsel to assist you in pursuing these monies awarded to you.

If I may be of further assistance, please contact me at 202-724-8064 or cduffie@dccouncil.us

Sincerely,

Celeste Duffie
Constituent Services Representative
Office of Councilmember Mendelson

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Office of the Chief Financial Officer

RECEIVED

2007 JUL 12 PM 2: 48

COUNCILMEMBER BARRY

★ ★ ★

Elliott Kindred
Director

Office of Finance and Treasury
Unclaimed Property Unit

2007 JUL 12 PM 1: 25
MAYOR'S CORRESPONDENCE UNIT

4/3/07

Geraldine Hobby
P.O. Box 441972
Fort Washington, MD   20749-1972

Dear Mrs. Hobby,

I am responding to your request to have resolution to your issue involving your search for a check for $57,599.32 from the Office of Risk Management. In my previous memo to you I have indicated that your name was not on my listing of uncashed checks (unclaimed property) that is reported to me by the District of Columbia's Central Accounting Office (OFOS). However I continued to research your case with other agencies. Initially I suggested that you talk to the Office of Risk Management directly to resolve this matter. You indicated a lack of trust with this department and that you wish to speak with the Ms. Valentine directly.

The Office of Pay and Retirement

I asked the Office of Pay and Retirement to research your name, dollar amount and social security number to determine if $57,599.32 was issued to you. Doris Ward, an assistant to the Payroll director performed research on the dollar amount and tax id. She could not find a check for this amount on microfilm. She called the Office of Risk Management and was informed that the case was closed. Mrs. Shirley Jones in the Pay and Retirement section indicated that stack wages may have referred to money that you received during the period of June 25th 1990 through March 1, 1997.

Technology Office (OCFO)

I asked the technology office to determine if they can research the name and dollar amount on their electronic records to determine if a check was printed on the District's vendor account from March 1997 going forward. They indicated that your name could not be found on the vendor file.

Vendor Information Center (D.C. Treasury)

I asked the vendor information center if your name and dollar amount was on their files. They could not find any.

**Office of Risk Management**

I asked the Office of Risk Management, Johnnie Winslow if they could determine if your case is still opened. Mrs. Winslow indicated that your case is closed and all proceeds were remitted to you.

**Office of D.C. Treasury (Disbursement Operations)**

The Office of D.C. Treasury, disbursing operations, could not find an outstanding check for the indicated amount in their records.

My recommendation is to have a dialog with the entity that was responsible for issuing the remittance. The agency that issued the remittance is assumed by the Office of Risk Management. I tried to meet with Ms. Winslow however she was on an extended leave. I suggest that you make final resolution directly with Mrs. Valentine's office. Hopefully they can resolve this issue for you. If you need further assistance from me please call me on 202-442-8195.

Sincerely,

Elliott Kindred

Elliott Kindred
Director, Unclaimed Property

| D.C. DISABILITY COMPENSATION PROGRAM | BENEFIT PAYMENT WORKSHEET | CLAIM NO.: *337470* SSN: *226 66 4229* |
|---|---|---|

**CLAIMANT'S NAME:** *Geraldine Hobby*

**2. Basis of Action:** *Per Remand Order # PBL No. 97-36 Please recompute benefits retroactive to 6/25/90 through 3/1/97 (less previously paid) and issue to claimant based on WAE.*

| 3. Health Benefit Enrollment Code No.: *N/A* ~~*735*~~ *No* | 4. Date of Health Benefit Enrollment: | 5. Employee's Workweek: S   M   T   W   T   F   S |
|---|---|---|

| 6. Weekly Pay Rate: *214.56* | 7. Compensation Rate (Plus Applicable COLAs): *3/4         5.0* | 8. Effective Date: |
|---|---|---|

| 9. Claims Examiner: *5/12/98* | 10. Certifier: | 11. Compensation Each Week: |
|---|---|---|

| 12. Comp. each 2 wks. | 13. Deductions ES AC | 14. Optional Insurance: | 15. Net comp each 2 weeks |
|---|---|---|---|

| 15. Compensation Rate | 17. Inclusive Dates | 18. No. Days | 19. Amount |
|---|---|---|---|
| *160.92* | *6/25/90 - 10/2/93* | *855 WD* | *27,517.32* |
| *169.00 (5.0 CPI)* | *10/3/93 - 3/1/97* | *890 WD* | *30,082.00* |
|  |  |  |  |
|  | *TOTAL OF REMAND :* |  | *57,599.32* |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| 20. Total |  |  |  |
| 21. Less Previously Paid |  |  |  |
| 22. Total Payment |  |  |  |
| 23. Remarks . |  |  |  |

D.C. Disability Compensation Program
IME Request Form

★★★

Claimant's Name & Address:

Geraldine F. Hobby
5913 North Hampton Boulevard
Virginia Beach, Virginia 23455

Claimant's Phone Number:

Claim Number: 337-470

Date of Injury:  2/22/90

Dear Dr. Cor-Vel:

Thank you for your willingness to examine this claimant and furnish a written report to the Disability Compensation Program.

Issues that must be resolved are identified below with additional issues on the enclosed Statement of Accepted Facts. Please address these issues as specifically as possible, since your findings will be used to make a determination on the status of this individual's claim. It is vitally important that we receive your report as soon as possible. You may fax the report to our office on: (202) 576-7292.

If you determine that additional testing or referral to clarify factors pertaining to your evaluation of the WORK-RELATED condition(s) of the claimant is needed, you are authorized to arrange that testing or referral.

## PLEASE RESPOND IN TERMS OF THE ISSUES CHECKED BELOW

x )   Is the claimant's disability causally related to the **FACTORS OF EMPLOYMENT?**
   )   If there are underlying non-work related conditions contributing to the disability , identify and give an estimate of the percentage of disability caused by these conditions. **PLEASE DO NOT ADDRESS THE MANAGEMENT OF THE NON-WORK RELATED CONDITION(S).**
x )   Is the claimant disabled for full and/or light duty as related to the **WORK RELATED CONDITION(S)?**
x )   Has maximum medical benefit been reached?
x )   Is there a permanent disability related to employment? If so, what is the degree, using the AMA Guide to Disability as a reference.
x )   If you think return to the duties performed prior to injury is not likely, is the claimant a candidate for Vocational Rehabilitation services?
x )   In your opinion should the procedure(s) or studies listed below, recommended by the treating provider, be authorized?
x )   WHAT ARE YOUR RECOMMENDATIONS FOR THE MANAGEMENT OF  THE WORK-RELATED CONDITIONS OF THIS CLAIMANT?
   Do you find there has been a recurrence of the following condition(s):

SUPERIOR COU.  F THE DISTRICT OF COLUMBIA
03ca010242 DOCKET        AS OF    5/04/04          EP2003

CAPTION: Hobby, G. vs D.C. Government, et al          USER:Richardson, Blan
ASSIGNED JUDGE  John M Campbell                      DEPT:CivClk

| FILED/<br>EVENT | PARTIES/<br>ENTRIES | DOCKETED |
|---|---|---|
| P001 | Geraldine T. Hobby | |
| P001A | (Pro se )<br>710 Carnoustle Lane<br>Fort Washington, MD<br>20744 | |
| | VS | |
| D001 | DC Government | |
| D001 | (Pro se )<br>441 4th Street, NW<br>Washington, DC<br>20001 | |
| 12/30/03 | Complaint for Abuse of process | 12/30/03 |
| 12/30/03 | (ORDER GRANTING) Motion to PROCEED in FORMA PAUPERIS,<br>seelg, fld 12/30/03<br>BY        J/Wertheim | 12/31/03 |

_____(Extended Text)
    ORDERED, that said motion is granted, and the prepayment of court costs is
hereby waived
_____

| 12/30/03 | Motion to PROCEED in FORMA PAUPERIS<br>BY        Hobby | 12/31/03 |
| 03/10/04 | Continued to 040423ss @ 9:30am from 040402ss - By consent<br>ATTY. SIMMONS<br>FSDATE:<br>LSDATE:    040402ss cnc | 03/10/04 |
| 03/11/04 | Dismissed without prejudice pursuant to Rule 4(m) as to<br>ALL DEFTS<br>BY        (clerk) | 03/11/04 |
| 03/19/04 | MOTION to dismiss or in the alternative for summary<br>judgment<br>BY        district | 03/22/04 |
| 03/22/04 | Praecipe stating that the mot of deft DC to dismiss the<br>cmpt or in the alterantive for summ judg the certificate<br>of serv, seelg<br>BY        DC | 03/24/04 |

_____(Extended Text)

PAGE        1 of        2

EXHIBIT E

Testimonial

James Fowler

Kelly Valentine

It appears that the City Council and Council didn't approve the transfer of the disability Corp Program to ORMV

Testimna

Jana Jacob

Kelly Valentine

It appears that the City
Council and Congress didn't
approve the transfer of the
Charity Comp Program (50RMS)
TPR

**Council of the District of Columbia**
**Committee on Government Operations**
**October 30, 2003**
**Testimony**
**Executive Office of the Mayor**
**Office of the City Administrator**
**Office of Risk Management**

Good morning Chairperson Orange and Committee members. I am James J. Jacobs, the Director of Risk Management for the Government of the District of Columbia. With me at the table today is Phyllis Dailey, our Claims Bureau Manager, and Pamela Brown, Supervisor of our Disability Compensation Claims unit. It is our pleasure to participate in this hearing on the administration of the District of Columbia Disability Compensation Program.

As you know, since July 2002 administration of the District's Disability Compensation Program has occurred from the Office of Risk Management in the Office of the City Administrator. Between October 2001 and July 2002 administration occurred from the District of Columbia Office of Personnel. Prior to that, the Program was administered in the Department of Employment Services.

A brief summary of the pertinent historical issues of this Program may be helpful to understand the organizational migration to its current location. It is apparent from reading the communications, audits, reports and other

1

documentation that there were multiple issues, concerns and perspectives relative to the administration of the Program while it was in the Department of Employment Services. These led to an administrative decision to find an alternative organizational location for the Program that may be better equipped to resolve the issues being encountered. This occurred during the first part of 2000 with the decision to move the Program to the District of Columbia Office of Personnel.

At the time, the District did not have an organized risk management function yet. The decision to resolve that organizational deficiency was implemented in November of 2000 with the appointment of the District's first Director of Risk Management. It did not take long for the obvious best practice idea of placing the claims administration functions in the newly forming Office of Risk Management to surface. It is quite common, both in the public and private sectors, for claims administration to be done in the risk management office. Unfortunately, the timing of the Program migration and implementation of the new risk management initiative did not allow for a direct migration of the function to the Office of Risk Management. So the Program became the responsibility of the Office of Personnel for the year, with direct consultation and professional guidance from the Office of Risk Management.

To begin to address some of the issues cited in the stated purpose for this oversight hearing I would like to offer our understanding of what the Disability Compensation Program is. At perhaps the most basic level, the Program is the administrative process of continuing employee compensation and related employee benefits to employees who become unable to perform their normal employment duties due to an accident or illness caused by, and in the course of, their employment with the Government of the District of Columbia. Worker's compensation law is a well-established body of law that defines the nature and scope of this employer-employee relationship relative to continued compensation and related administration parameters. Thus, like all other worker's compensation programs, our Program has the fundamental objective of ensuring that employees who become unable to perform their normal work functions because of a work-related injury or illness receive continued employment- related income and appropriate medical care for the purpose of facilitating their efficient and effective restoration to the workforce. It is our obligation and intent to ensure that the Government of the District of Columbia does this completely and solely to the extent it has an obligation to do so.

Consideration of what the Program is not may help answer some questions about appropriate organizational placement of the Program. While

the objectives of the Program are solidly based on the employment

relationship, worker's compensation, or disability compensation as we have

labeled it in the District for the public sector, is not an employee benefit such

as those found in the Office of Personnel that are designed "to attract,

develop and retain a highly qualified, diverse workforce". Rather, the law

creates a specific liability upon the District resulting from work conditions

or process.

  While that liability is defined by law and may on occasion require

"legal services" such as litigation support and counsel, the Disability

Compensation Program is not a legal process requiring professional

guidance through the legal system such as the "legal services" found in the

Office of the Corporation Counsel. Rather, the Program is an administrative

process inside the government that responds to the liability defined by law

and implemented within the context of the District government's normal

business processes.

  While disability compensation is an employment –related issue, it is

not the "delivery of employment-related services to residents of the

Washington metropolitan area so that they can achieve workplace security

and economic stability" as that found in the Department of Employment

Services. Rather, based on the employment relationship of District

government employees to the Government, the Disability Compensation Program implements the administrative process of delivering defined employment-related obligations to the employee towards restoring the normal employment relationship, or managing the process to another permissible resolution as business prudence dictates.

As you know, we contract with a third party administrator to assist our Claims Bureau in the administration of the Program. That contractor is currently an organization named CLW/CDM. The business of third party administration (TPA) of worker's compensation claims is well established and substantively consistent. Some of the main functions performed by the TPA on our behalf include compensability determinations, claims investigations, medical cost control and utilization management, and vocational rehabilitation services.

We regard the TPA as an extension of our Claims Bureau. Therefore, we manage the TPA similarly to how we would manage our internal employees and functions. Our Claims Bureau staff and an independent auditor review and assess the performance of the TPA through claims service audits, file reviews, monthly meetings and employee surveys. These assessments help to ensure that best practices are used in the various generally accepted claims administration functions. Also, we utilize routine

business processes with built-in internal controls to achieve Program efficiency and effectiveness. For example, while the TPA prepares the regular "payroll", our Claims Bureau staff reviews the report applying various reasonableness tests and verifications prior to our actual processing of payments.

The Disability Compensation Program is intended to be a cooperative and supportive process that seeks to ensure that injured employees receive timely and effective medical care and continuation of compensation if required to facilitate the restoration of the normal employment relationship. It aims to do so as expeditiously as possible, within the context of fiscal responsibility. For the most part we are successful in achieving this intention. Due to the nature of worker's compensation decision making however, the Program does require informed discretionary judgments about certain aspects of claims like, compensability, reasonableness of care, and the extent of the District's obligations. These judgments are sometimes disputed. Disputes occasionally escalate given the very personal nature of claims. Our Claims Bureau staff and the TPA are regularly reminded to demonstrate total professionalism and exert every human effort to resist personal engagement.

To that end, we place much emphasis on making the process effective, because it contains built-in dispute resolution alternatives. These include internal reviews and reconsiderations as well as formal appeals alternatives. We have provided your office with separate information in preparation for this hearing that details the process. That information also clearly demonstrates that the disputes are relatively few compared to the general effectiveness of the process.

In conclusion, I want to thank you for beginning this dialogue on an important program of the District operations. We are intimately familiar with the challenges we have inherited with this program, but we are confident that the path we have embarked on is technically and professionally sound. It will yield positive results if we can count on your continued support and judicious oversight. We look forward to working with you to that end. We would be pleased to answer any questions you may have.



**District of Columbia Government**
## Office of Risk Management

---

### February 23, 2004 Testimony

**Council of the District of Columbia**
**Committee on Government Operations**
**Performance Oversight Hearing**
**FY 2003 and FY 2004**

Good afternoon Chairman Orange, committee members, staff and observers. I am James J. Jacobs, Chief Risk Officer for the Government of the District of Columbia. It is my pleasure to be here today to talk about the performance of the D.C. Office of Risk Management. With me today are the members of my senior management team who have a vital role in the accomplishment of our agency objectives. They are, Robert K. Lisk, my Assistant Director for Risk Identification and Analysis, John J. Dougan, my Assistant Director for Risk Control, Rosenia D. Bailey, my Assistant Director for Risk Administrative Services, and from our Risk Financing Division, Phyllis L. Dailey, our Claims Bureau Manager.

I think there is particular significance to this hearing as it is the first performance oversight hearing for the D.C. Office of Risk Management that came into existence officially as an agency just December 15, 2003. This represents a significant accomplishment for the District as it establishes, for the first time in a formal program of risk management, the management best practice of anticipating possible threats to the accomplishment of our objectives, implementing appropriate control measures, and professionally managing the process of paying for those losses that occur despite our best efforts. Our challenge is to maximize the benefits of this initiative by ensuring that the processes become institutionalized and adequately resourced.

Though we only became an agency at the end of 2003, the risk management function has been evolving in the District since November 2000. The impact of that

1

evolution has been noticeable. This testimony will highlight that impact and identify some of the challenges we still face. In response to your pre-hearing communication, we have provided much information about our operations. That material has been further updated and included as attachments that I will refer to, but not repeat in detail unless you would like me to.

You asked us to speak to the organizational structure of the new Office of Risk Management and the specified mission and goals for this office. Of course this information is available in great detail in the Reorganization Plan No. 1 of 2003 for the Office of Risk Management, which is now part of the public record. However, I will provide an overview. The mission of the D.C. Office of Risk Management (DCORM) is to provide risk identification, analyses, control and financing direction, guidance and support to District agencies so they can minimize the total cost of risk. This includes the cost of retained losses, risk control costs, net transferred risks and administrative costs. This is accomplished by systematically identifying and analyzing exposures to risk, selecting and implementing appropriate risk control strategies and prudently financing anticipated and incurred losses into a District-wide risk management program.

The strategic objectives of DCORM are: institutionalization of risk management as a regular District-wide and agency-specific function; systematization of the identification and analysis of District-wide and agency-specific exposures to risk; minimization of the likelihood and severity of losses through effective safety and security risk control strategies; and formalization of the philosophy, policies, and procedures for financing identified risks and incurred losses. As referenced in our mission statement, the key result measure for DCORM is the District government's total cost of risk. Our goal is to support District agencies so they can minimize the total cost of risk.

Pursuant to the Disability Compensation Program Transfer and Risk Management Congressional Review Emergency Amendment Act of 2003, a report is due to the Council regarding the District's cost of risk and plans implemented to control those risks. Attachment #1 is provided to satisfy that requirement. First you should note that this is

2

new for FY 2004. Therefore, the quality of the quantified data is evolving as all staff begins to understand the concept and where to find the necessary information. Also, comparative data is not as complete as subsequent years should be. One of the weaknesses to not having a formal risk management program until now is the absence of relevant data in a readily accessible format to allow efficient strategic and tactical management decision-making.

Despite these caveats, the report reveals significant information. It captures the cost of risk components by agency and in the aggregate for the District government. The largest component, and incidentally easiest to capture and quantify, are the actual losses. These are separated into disability compensation program losses, tort liability losses, and other losses such as property and vehicle-related losses. Actual losses are also the only component where we have at least annual aggregate comparison information. It is noteworthy that, since the inception of the risk management function in the District, there has been a favorable downward trend in total actual losses. The impact of heightened awareness alone cannot be ignored. The trend is most noticeable in disability compensation program losses where we have had the most direct involvement until now. The report shows a decrease in disability compensation losses of approximately 2% for FY 2003 over FY 2002. However, the actual impact of our risk management efforts is closer to a 10% decrease because the FY 2003 total includes approximately $2.4 million of disbursements related to delayed prior period claims that we moved to completion. It is reasonable to expect this positive trend downward to continue.

Attachment #1 also contains our agency risk management accountability charts for FY 2003 and FY 2004 to date. Part of the operational support clause in each agency director's performance contract includes requirements to implement the risk management program in their agency. Our office tracks the core components of that implementation on these accountability charts. This helps each agency stay focused on their risk management program in a consistent and systematic way in all agencies. It also allows DCORM to help each agency develop and maintain their agency risk management plan, which is the core of their risk management program. It is a prioritized list of the things

3

that could go wrong and/or threaten the effectiveness of their programs, along with their plans to control those exposures. These activities drive down the cost of risk.

We attempt to accomplish our mission and strategic objectives through the organizational structure shown in attachment #2. You will notice that these organizational charts compare to those contained in the Reorganization Plan documentation referred to earlier, except that I have only labeled those positions that correlate to the FTE cap of twenty-three (23) imposed on us for FY 2004. You will also notice that we are organized in a manner consistent with the broad function areas outlined in our mission statement, namely risk identification and analysis, risk control, risk financing, and risk administrative services. The comprehensive nature of these organization charts allows us to work from them to complete this testimony by operating division of DCORM. It may also be useful to refer to attachment #3, which is the revised version of the responses we submitted to your pre-hearing questions.

The Risk Identification & Analysis Division (RIAD) is responsible to provide guidance, coordinate and integrate the work of the Agency Risk Management Representatives (ARMR), who are essentially responsible for implementing an agency risk management program in each agency on behalf of the agency director, and facilitate the aggregation of the District's cost of risk by agency. To that end, during FY 2003 we conducted five (5) agency risk management representative (ARMR) orientation session with 15 participants and had forty-five (45) one-on-one visits with ARMRs. Already in FY 2004 we have conducted another five (5) ARMR orientation sessions with fourteen (14) participants and had forty (40) one-on-one visits with ARMRs.

The agency Risk Assessment and Control Committee (RACC) is the group in each agency that manages the tactical implementation of the agency risk management plan. An effective RACC is critical to the success of the agency risk management program. Therefore, during FY 2003, we conducted six (6) RACC training sessions with eighty (80) participants and attended six (6) agency RACC meetings. Thus far in FY 2004 we have conducted nine (9) RACC training sessions with one hundred nineteen

(119) participants and attended twenty-seven (27) RACC meetings. In addition, all agency submissions such as agency risk management plans, RACC minutes, quarterly reports of risk management plan status, cost of risk reports and agency emergency response plans, are being reviewed and feedback is being provided to agencies.

While these accomplishments are significant, there are obviously challenges to the work of RIAD. There are approximately thirty-seven (37) agencies in the immediate priority group within which we still have considerable work to do, before we are able to think about the exposures in the legislative and judicial branches and the "independent" agencies. As indicated in attachment #3, limited resources will affect the extent of our impact.

The Risk Control Division (RCD) is responsible for the performance of duties as the Occupational Safety and Health (OSH) function for District of Columbia "public" employees, assistance in identifying appropriate mitigation strategies for reported exposures, providing a proactive, consultative program for safety, security and contingency planning for emergencies, providing guidance on contemporary issues like ergonomic guidelines, workplace violence prevention, exposure to lead in drinking water, hazardous materials, material handling, confined spaces, etc. and follow-up of investigations and general risk and security assessments.

During FY 2003 we issued one (1) compliance directive, responded to more than fifty-five (55) reports of unsafe conditions, conducted two (2) risk control site assessments and issued two (2) sets of topical guidelines. Thus far in FY 2004, we have issued one (1) risk control alert, responded to more than twenty-nine (29) reports of unsafe conditions, conducted six (6) risk control assessments, and issued eighteen (18) sets of topical guidelines and briefs. We have also reviewed and re-written the D.C. Occupational Safety and Health Plan for federal review and are leading a multi-agency task force developing a workplace violence prevention policy and protocol.

As with RIAD, these significant accomplishments have been achieved despite limited resources. In the case of RCD though, maximum effectiveness also require testing and evaluation that often cannot be performed because there is no testing equipment and/or there are no resources to send samples to labs for evaluation. In addition, some sampling requires various types of Personal Protective Equipment (PPE) to be worn by investigators during the sampling process; yet current resources are inadequate to fill PPE needs for our staff.

The Risk Financing Division (RFD) is responsible for the management of disability compensation and liability claims and planning for the appropriate reporting and funding of those obligations and exposures including coordination of actuarial analyses, review of contractor certificates of insurance and guidance to agencies and the Office of Contracting and Procurement on appropriate insurance requirements for vendors.

A separate hearing was conducted on the operations of the disability compensation program on October 30, 2003, so we have not repeated much of the testimony presented then. We have included attachment # 4 as a follow-up to that hearing. It documents the status of those specific cases raised and indicates diligent follow-up. It, too, has been updated since our pre-hearing submission. We have made significant advances in the management of the disability compensation program. The number of outstanding claims is steadily declining, the amount of losses paid is declining significantly, agency training is showing positive signs of effectiveness, and we are steadily resolving the historic problem cases. We expect to apply similar process improvements to the recently consolidated tort liability claims management function. Already, there is greater awareness of the issues in the agencies because of the risk management program.

The risk funding function in the Risk Financing Division is also in place and showing positive results. We completed a study of risk financing alternatives that helped identify a critical path to more deliberate risk financing strategies. It also produced

2/23/2004

6

actuarially supported budget requests for the disability compensation and settlements and judgments funds. We reviewed and re-drafted the insurance requirements section of the procurement templates for contractors and drafted revisions to the procurement regulations relative to insurance requirements and verification thereof. We established a protocol for the review of insurance documentation by service and product providers and have assisted multiple agencies with that review.

While there are resource challenges in this division, the priority challenges are to resolve the backlogs of claims issues inherited, and raise the competency levels of staff to the new performance protocols and standards. There are also large issues such as providing our technical expertise to the Police and Fire disability compensation program issues that we are currently unable to address.

The Risk Administrative Services Division (RASD) is responsible for providing administrative support to DCORM including IT systems, procurement, contract management, human resources, finance and budget coordination, communication service, customer service and performance management. This division has helped us successfully co-locate all our staff into a single, more professional location and worked with the Office of the Chief Financial Officer to create a consolidated budget for the new Office of Risk Management. We have also purchased our new risk management information system to facilitate useful data accumulation for more effective reporting and analysis. Full implementation is expected later this fiscal year. We have also begun to use the Recommendation Tracking System for monitoring the follow-up of outstanding findings, orders and recommendations by agencies. We expect this to be integrated into our risk management information system this fiscal year as well.

In summary, even I am sometimes amazed at how much progress we have made in implementing this critical management best practice of deliberate professional risk management in the District government, despite the very limited resources allocated. I believe that is a tribute to the dedication of the staff who are represented by my senior management team here today. We believe the District's cost of risk can be driven down

7

even more with continued support, diligent effort, and adequate resources. We are counting on your support to make this happen. We will be happy to respond to any questions you may have.



**District of Columbia Government**
## Office of Risk Management

**September 17, 2004 Testimony**

**Council of the District of Columbia**
**Committee on Government Operations**
**Public Roundtable**
**Bill 15-873**
**"Disability Compensation Effective Administration Amendment Act of 2004"**

Good afternoon Chairman Orange, committee members, staff and observers. I am
James J. Jacobs, Acting Chief Risk Officer for the Government of the District of
Columbia. It is my pleasure to be here today to begin a conversation about the proposed
Bill 15-873, the "Disability Compensation Effective Administration Amendment Act of
2004". With me at the table today are, Phyllis L. Dailey, our Claims Bureau Manager,
and Pamela A. Brown, our Claims Supervisor for the Disability Compensation Unit. The
other members of my senior management team are also available here to assist with any
questions that may arise.

We have examined the proposed Bill in the context of the complete "Disability
Compensation Act" as contained in D.C. Official Code § 1-623 as well as current
workers' compensation program administration best practices. In general, it is our
conclusion that the proposed Bill requires extensive developmental work and may be
redundant and/or unnecessary to the limited extent it reaches. We will attempt to
demonstrate how we arrived at this conclusion and offer an alternative approach that may
be more effective at achieving meaningful statutory reform.

It appears that a predominant underlying motivator for the proposed Bill is a
concern about due process and related timing in the processing of injured employees'
claims. This valid concern has already been noted by our program transition analysis,
several audits, and a class-action lawsuit. As a result, several improvements in due
process have been implemented such as revised reporting forms, periodic mailings to

1

claimants, supervisors training and sustained reasonable turnaround time for compensability decisions. Other improvements such as the resolution of the backlog of reconsideration requests have been identified but are in various stages of implementation with timing and effectiveness largely being moderated by limited available resources. Still other improvements, including a re-issuance of the relevant District Personnel Manual section describing due process, are the subject and outcomes of extensive negotiations and development pursuant to the outstanding class-action litigation.

The underlying motivator for this proposed legislation has been recognized and addressed as described. This leads us to conclude that the proposed legislation may be redundant and/or unnecessary. Further, to the extent improvements have not yet been implemented, the proposed legislation does not provide any additional expediting resources, and may complicate the natural outcomes of the outstanding litigation resolution. At best, it appears this type of legislative solution might be premature.



We do believe that statutory reform in this area is indicated. Not only are there issues within this referenced Act that should be examined, but we believe that the multiple "workers' compensation" type programs in the District contributes to some of the confusion and inaccurate expectations. As you are aware, we have a workers' compensation program for the private sector, a disability compensation program for the police and firefighters, a disability compensation program for the public sector, which also has differing provisions for some District government employees arising from the Federal system. It suggests to us that a minimum step would be a formal review and reconciliation of the various program provisions in search of commonality, consistency and efficiency to the maximum extent possible. Thereafter, a comparison of best practices and legislation from other jurisdictions may lead us to a more comprehensive and effective statutory reform package.

Notwithstanding our general conclusion and preferred path to statutory reform, we want to identify some specific concerns with the proposed Bill. For ease of reference

we will make our observations with reference to the page and line numbers of the proposed Bill.

*Page 1, lines 36 through 42:*  proposes adding a paragraph dealing with issues related to the time for making a claim; finding of facts; award; right to hearing; and conduct of hearing, to §1-623.03, which is currently titled "Medical services and initial medical and other benefits". The proposed paragraph appears to be more accurately related to the existing § 1-623.24. Also, all the referenced content of the proposed new paragraph is already addressed by the existing Act, except the 14-day deadline on determining compensability. This proposed deadline uses the receipt of notice of injury as the trigger even though the requirements of such notice pursuant to § 1-632.19 do not include the requisite medical documentation to make a compensability decision, and supervisors report.

*Page 2, lines 2 through 4:*    proposes adding a phrase that defines the requirement for immediate reporting of an injury as within 3 days. This is a generous definition of "immediate" that is inconsistent with the targeted best practice of reporting within 24 hours.

*Page 2, lines 6 through 11:*    proposes imposing a 30-day time limit on any utilization review organization or individual to deliver their report. While this often occurs, the utilization review process sometimes requires requests for additional information from other medical service providers or the claimant. Cooperation is not always given. The proposed requirement makes no provision for these kinds of circumstances.

*Page 2, lines 13 through 15:*  proposes giving the right to question the medical evaluation of the utilization review organization to the employee as well as the primary care provider. With few exceptions, employees do not possess the medical expertise to credibly question a medical opinion. They have a legitimate right to disagree and/or question such medical opinion through the provided right given to their primary care

provider. In this way medical professionals are communicating with medical professionals.

*Page 2, lines 17 through 22:* proposes to give "great weight" to the medical opinion of the employee's treating physician in all physical examinations. This approach is not consistent with existing case law and goes significantly beyond the preference expressed in the treating physician's rule. A physical examination in the context of this program is to determine the diagnosis, prognosis and medical care required. It is used as one factor in determining compensability. Case law has clearly established that a properly documented report by an attending physician *may* be given additional weight on the basis that the length of time a particular physician treats a claimant is a valid factor in the weighing process because it suggests the physician will have a greater familiarity with the claimant's condition. But, the courts have held that according greater weight to such an opinion *merely* because the physician has (by definition) spent more time treating the claimant is circular reasoning that is just a restatement of the preference for the treating physician's opinion. Thus, although the treating physician's opinions are preferred, they must nonetheless be supported by sound, independent medical reasons if they are to be given legal effect, and according "great weight" to them in *all* circumstances would thus be unjustified. Courts have also noted that treating physicians often succumb to the temptation to accommodate their patients (and their survivors) at the expense of third parties such as insurers, which implies attaching discount rather than preference to their views. (see *Peabody Coal Co. v. McCandless*).

*Page 2, lines 25 through 27:* proposes limiting the investigation of a claim to no longer than 30 days from the date the claim is filed. The Act places a continuing responsibility on the Mayor to determine and make finding of facts relative to claims presented. By their nature, disability compensation claims are dynamic as claimants progress through treatment and recovery. This requires ongoing investigation until the claim is closed.

*Page 2, lines 40 through 45:* proposes payment of claimant's attorneys fees for decisions in favor of the claimant before the administrative law judges, payable when the

9/17/2004

compensation order becomes final. This proposal alone carries material potential fiscal impact. Other jurisdictions treat attorney's fees as a 0% of recovery, and the claimant is responsible for those fees on the basis of their contract with their attorney. Administrative law judges willingly state their interpretation and application of the law bias in favor of the employee, in part due to the challenges of being represented. Further, there is some question as to when a compensation order would become final, given that an appeal process is available.

*Page 3, lines 3 through 30:*    proposes limitations on modifications to compensation awards based on changes to the claimant's condition and defines an appeal and reconsideration process. Generally, this section addresses the substance of the outcomes anticipated from the outstanding litigation, including issues related to appellate procedures and timeframes for reconsideration. The potential conflict between the legislation and the litigation process do not appear to be in the best interest of the District. Best practices require a legislative provision that motivates expeditious return to work and discourage malingering. Also, the proposed requirement to initiate payment of compensation upon receipt of a reconsideration request creates an unacceptable new set of expenditures for those cases that have been controverted or are not receiving payments already. There is also a class of claimants whose reconsideration requests would not merit the initiation of continued compensation, such as those whose compensation awards were terminated for fraud, those who have returned to work voluntarily following a clearance to return to work from his or her treating physician, and those who are no longer entitled to augmented compensation because a claimed dependent no longer meets the criteria set forth in D.C. Code § 1-623.10. Payments to these claimants do not appear to be in the best interest of the District and in some instances may be contrary to law.

*Page 3, lines 33 through 45:*  proposes changes to the career and educational services retention rights that we believe have already been made. The additional phrase change on lines 38 through 41 is technically more accurate under the existing wording of the Act.

5

9/17/2004

*Page 4, lines 1 through 6:*     references a fiscal impact statement. We are interested in reviewing any such fiscal impact statement, as we believe this proposed Bill has a significant potential fiscal impact.

That concludes our initial review of the proposed Bill. We understand that there is a long process ahead of the proposed Bill. It is our hope that our testimony here today will be helpful in accomplishing meaningful and effective statutory reform. It is obvious that we do not believe that this Bill accomplishes that. However, we are committed to working with you and the Committee towards that goal. Thank you for allowing us the opportunity to provide this testimony today. My staff and I would be happy to respond to any questions you may have.

6



**District of Columbia Government**
## Office of Risk Management

### September 17, 2004 Testimony

### Council of the District of Columbia
### Committee on Government Operations
### Public Roundtable
### PR 15-879
### "Chief Risk Officer, James J. Jacobs Confirmation Approval Resolution of 2004"

Good afternoon Chairman Orange, committee members, staff and observers. I am James J. Jacobs, Acting Chief Risk Officer for the Government of the District of Columbia. It is my pleasure to be here for this important step in the evolution of the risk management program of the District government.

On April 22, 2004 Mayor Williams formally communicated to the Council his nomination of me to serve in the position of Chief Risk Officer for the District of Columbia government. In that communication he presented a summary of my qualifications for the position along with his reasons for the nomination. I am pleased to provide a supplemental summary of what has been accomplished to date in this important Mayoral initiative of implementing a formal risk management program in the District government.

Prior to November 2000 there was no risk management program in the District government. Some component functions of a risk management program were being performed to some degree in various places in the government. Mayor Williams and the City Administrator recognized the management deficiency as part of the Mayor's priority of "making government work better". As a result, I was recruited to develop and implement a state-of-the-art risk management program for the District government.

I came here directly from a similar position as County Risk Manager in Arlington County, Virginia where I was re-modeling their risk management program. The

1

perceived challenge of creating and implementing this vital business function for the nation's capital was irresistible. Service has always been a strong motivator to me. More than twenty-three years ago I began this professional path in the private sector, spending the first three years getting the insurance company and insurance brokerage perspective. Thereafter, I moved into the private non-profit arena for about fourteen years followed by my public sector experience. There is great satisfaction derived from providing service.

What we set out to do in November 2000 was to establish the essential business process we refer to as risk management, that is designed to systematically preserve the physical, human, and financial resources of the government through the deliberate process of implementing decisions that minimize the adverse effects of accidental losses on the government. Ultimately, our goal is to achieve an effective risk management program with a reasonable cost of risk resulting in reduced loss costs. Cost of risk includes the cost of actual losses, costs of risk control efforts and other outside service costs.

Given the previously described non-existence of a risk management program in the District government, our task would involve extensive education and culture change. We chose a "matrix" model for the program that requires front-line agency involvement in the risk identification and analysis and risk control activities with technical and programmatic guidance and control from the Office of Risk Management, as well as a centralized risk financing function in the Office of Risk Management. This organization-wide approach to risk management is sometimes referred to in the profession as enterprise or holistic risk management. It is a cutting edge approach to risk management, particularly in the public sector.

Creation of a new agency required all the functions and challenges of establishing any new business. The basic management tasks of planning, organizing, staffing etc. had to be performed, and had to be accomplished within the context of a government bureaucracy and a period of budget pressures. Not only did we want to establish the

9/17/2004

2

Office of Risk Management, but also simultaneously wanted the actual risk management program to be implemented.

So, we required each agency to identify an agency risk management representative as the agency champion and representative of the agency director relative to all the risk management program implementation requirements. We drafted the terms of reference for the District Risk Management Council that focus on monitoring and assisting in the effective implementation of the agency risk management programs. Since the beginning, this group of agency risk management representatives and Office of Risk Management Staff has been meeting as the District Risk Management Council regularly every month.

Meanwhile, we moved through the demanding process of consolidating the various pieces of risk management functions into a single organizational location. This included the disability compensation program from the Department of Employment Services via the D.C. Office of Personnel, the public sector occupational safety and health program from the Department of Employment Services, and the tort liability claims unit from the Office of the Attorney General then known as the Office of the Corporation Counsel. So, where there was a shared staff person and me in November 2000, the consolidation and organization has successfully created an office with twenty-three authorized staff.

The organization requires a clear guide and authority identifying its role and purpose in the District government. Therefore, a critical task was to document the vision and craft comprehensive reorganization legislation for passage by the Council. This was accomplished in the Reorganization Plan No. 1 of 2003 for the Office of Risk Management that was adopted by the Council in December 2003, thereby officially creating the new D.C. Office of Risk Management as a subordinate agency. Along with the organizational and legislative establishment, we also established a physical location for the new agency and equipped it to accomplish its functions.

provider. In this way medical professionals are communicating with medical professionals.

*Page 2, lines 17 through 22:* proposes to give "great weight" to the medical opinion of the employee's treating physician in all physical examinations. This approach is not consistent with existing case law and goes significantly beyond the preference expressed in the treating physician's rule. A physical examination in the context of this program is to determine the diagnosis, prognosis and medical care required. It is used as one factor in determining compensability. Case law has clearly established that a properly documented report by an attending physician *may* be given additional weight on the basis that the length of time a particular physician treats a claimant is a valid factor in the weighing process because it suggests the physician will have a greater familiarity with the claimant's condition. But, the courts have held that according greater weight to such an opinion *merely* because the physician has (by definition) spent more time treating the claimant is circular reasoning that is just a restatement of the preference for the treating physician's opinion. Thus, although the treating physician's opinions are preferred, they must nonetheless be supported by sound, independent medical reasons if they are to be given legal effect, and according "great weight" to them in *all* circumstances would thus be unjustified. Courts have also noted that treating physicians often succumb to the temptation to accommodate their patients (and their survivors) at the expense of third parties such as insurers, which implies attaching discount rather than preference to their views. (see *Peabody Coal Co. v. McCandless*).

*Page 2, lines 25 through 27:* proposes limiting the investigation of a claim to no longer than 30 days from the date the claim is filed. The Act places a continuing responsibility on the Mayor to determine and make finding of facts relative to claims presented. By their nature, disability compensation claims are dynamic as claimants progress through treatment and recovery. This requires ongoing investigation until the claim is closed.

*Page 2, lines 40 through 45:* proposes payment of claimant's attorneys fees for decisions in favor of the claimant before the administrative law judges, payable when the

4

and twenty-three authorized FTEs, of which only nineteen were funded. That does not happen without dedicated, diligent, and self-sacrificing employees. It is my sincere opinion that the District government can be proud of, and should be grateful for the work that has been given by the employees of the Office of Risk Management. I especially want to acknowledge the members of my senior management team who have endured my sometimes maniacal, but always reasonable demands to accomplish what we have.

I hope this overview has been useful in your assessment of my administration of the Office of Risk Management to date. Much has been accomplished, but we know there is much to do yet. Maximizing our future accomplishments will require steady, informed leadership and adequate resources. I would be happy to respond to any questions you may have.



**District of Columbia Government
Office of Risk Management**

**June 11, 2007
Testimony of Kelly L. Valentine
Interim Director**

**Committee on Workforce Development
And Government Operations
Public Oversight Hearing on the Findings and Recommendations
of the Office of the Inspector General in its
"Audit of the District of Columbia
Employee Disability Compensation Program"**

Good afternoon Chairman Schwartz, Committee members, staff and observers. I am Kelly Valentine, Interim Director for the Office of Risk Management. It is my pleasure to be here today to talk about the Findings and Recommendations of the Office of the Inspector General in its "Audit of the District of Columbia Employee Disability Compensation Program."

I will use the OIG recommendations as a framework for my testimony. The OIG states in Recommendation 1 that, **"DCORM should conduct a one-time review of all open claims to prioritize and identify those cases where additional case management efforts could return employees to work or otherwise remove them from the Disability Compensation Program.**

I agree with Recommendation 1, and believe DCORM has satisfied the recommendation. However, I continue to disagree with the OIG's **audit findings**. DCORM conducted an additional review of all open indemnity and medical only claims and a total of 1461 files were reviewed to reconfirm the appropriateness of payments, develop or review case strategy to facilitate a return to work or final disposition of the claim. A claim file breakdown by claims adjuster was provided to you in advance of my testimony today.

As a result of the complete claims review we respectfully continue to dispute OIG's audit finding that **"based on the results of our sample, we estimate that case management**

deficiencies resulted in potential unnecessary and inappropriate costs involving between 310 and 380 claims totaling between $2.7 and $3.3 million annually." It was determined after a review of the files that a total of approximately $1,135,483.26 in overpayments have been made during the administration of the program. This amount covers a period from 1997 to present. These overpayments occurred as a result of claims mismanagement by various District Agencies and three Third Party Administrators. Of the $1,135,483.26, a total of $73,813.21 has been recovered to date, with an additional $138,000 due from CMI/ Sedgwick, once a contract modification is complete, due to the efforts of DCORM. The agency is in litigation with TPA No. 2 regarding their outstanding amount; OAG is handling that matter for us. TPA No. 4 has agreed to a plan to reimburse DCORM for overpayments occurring as a result of their prolonged transition and therefore their inability to properly review claims in a timely manner.

These results show dramatic decreases in the number of open cases (from 2208) and the number of injured employees receiving benefits since the inception of the contract with CMI/Sedgwick. As such we believe that Recommendation One has been satisfied. We will continue to conduct audits of CMI/Sedgwick and pursue the collection of overpayments from employees and former TPA's.

The OIG states in Recommendation 2 that, "DCORM should perform quarterly verification checks of disability compensation recipients by reviewing OPRS payroll records and records available from OPM for the civil service retirement system."

I agree with Recommendation 2. We have established a working group with the appropriate staff members in OCTO and the CFO to establish a linkage or verification process between the S.O.A.R., CAPPS, UPPS and ultimately the retirement system to eliminate duplicate payments to employees expeditiously. We will provide a date certain and/or timeline within 15 days. In the interim DCORM and CMI/Sedgwick continue to gather information regarding claimants payments by individual checks and balances with DCHR and OPRS.

DCP/OIG Audit Hearing
June 11, 2007
Page 2 of 4

The OIG states in Recommendation 3 that, "**Prior to initiating disability compensation payments, require claimants to acknowledge in writing that they understand that D.C. law prohibits receipt of salary or other compensation (excluding exceptions noted under D.C. Code 1-623.16 (2001)) for the District of Columbia while receiving disability compensation, and that failure to comply with this mandate could subject them to administrative action as well as criminal prosecution.**

I agree with this recommendation and DCORM has created a letter that is being sent to all claimants with the initial set of compensation forms for their review and signature.

The OIG states in Recommendation 5 that, "**Immediately begin performing quarterly performance audits of TPA as required by the contract and use the audit results to enforce the incentive and disincentive provisions in the TPA contract.**"

I agree with this recommendation and DCORM has been conducting audits. Pursuant to further review of the Third Party Administrator claims administration, DCORM established a client service plan (CSP) to serve as a reference for DCORM and representatives of the Third Party Administrator for claims handling guidelines above and beyond basic claims handling techniques. As a result of an audit that took place in December of 2006, the appropriate enforcement of the CMI/Sedgwick contract provisions has been resolved with CMI/Sedgwick noted by the recent payment of $290,000 as part of the disincentive provision of their contract. We have completed the April audit and are in the final stages of compiling the numbers in compliance with the contractual requirements.

The OIG states in Recommendation 6 that, "**DCORM should include in the Initial Determination notices, the claimant's benefits that would continue while the claimant receives disability compensation.**"

DCORM has satisfied this recommendation. To clarify the notification process, there is a need to understand that there is a phased notification process. Initially when the claim is received an initial package of forms is sent to the employee. (See Exhibit A). Once the

DCP/OIG Audit Hearing
June 11, 2007
Page 3 of 4

claim is investigated a "Notice of Acceptance" or "Denial" is sent to the employee (See Exhibit B) and upon the start of payment of benefits a " Notice of Determination Regarding Start" or "Resumption of Benefits" is sent to the employee which explains the claimant's benefits that would continue while the claimant receives disability compensation (See Exhibit C).

The OIG states in Recommendation 8 that, "**DCORM should provide claimants with a record that shows the pay deductions for health and life insurance benefits.**"
I agree with Recommendation 8. The Disability Compensation Prgram system upgrade and conversion occurred on June 1, 2007 and will test for the next 30 days. Upon completion of that testing the new system will allow the life and health pay deduction amounts to reflect the itemization on the checks. Further, the upgrade to the new system will provide additional capability to capture and report on injuries more specifically, it will facilitate the management of claims to an increased level of customer service and provide more granular financial accounting of claims by reserve type and direct expenditures.

We have begun discussions with the appropriate staff members in DCHR, to transfer the Life and Health benefits function back to DCHR as they are more equipped to manage the process. We will provide a date certain and/or timeline for accomplishing this task upon completion of our discussions.

In conclusion it should be noted that fact gathering for this OIG report commenced in the second quarter of Fiscal Year 2006. As you aware, BDO Seidman, LLP conducted an audit of the Disability Compensation Program in the first quarter of Fiscal Year 2007. As a result of the extensive management reform efforts undertaken and completed in FY 2006, management of the Disability Compensation Program went from a reportable condition in the FY 2005 CAFR, to an advisory comment in the FY 2006 CAFR.

In closing, I would like to thank you for your time and consideration of my testimony. I'm prepared to answer any questions that you may have.

DCP/OIG Audit Hearing
June 11, 2007
Page 4 of 4



District of Columbia Government
Office of Risk Management

February 16, 2007
Testimony of Kelly L. Valentine
Interim Chief Risk Officer

**Council of the District of Columbia
Committee on Workforce Development and
Government Operations
Performance Oversight Hearing
FY 2006 and FY 2007**

Good morning Chairman Schwartz, committee members and staff. I am Kelly
Valentine, Interim Chief Risk Officer for the Government of the District of Columbia. I
am here today to talk about the performance of the D.C. Office of Risk Management
(DCORM), which consists of the Disability Compensation Program (DCP), Tort Liability
Division, and the Risk Identification, Analysis and Control (RIAC) Division, which I
took over in November 2004.

I will be sharing information about the Office of Risk Managements performance
for FY 2006 and FY 2007. The mission of the Office of Risk Management is to provide
risk identification, analyses, control and financing direction, guidance and support to
District agencies so they can minimize the total cost of risk. The mission of the Office of
Risk Management is accomplished by identifying and analyzing exposures to risk,
selecting and implementing appropriate risk control strategies and managing incurred
losses. Although the mission of the office is multifaceted, in FY 2006 we continued to
focus a great deal of our efforts on the Disability Compensation Program and organizing
the Financial Division to support necessary changes.

To help explain the magnitude of the disorganization and by way of history, the
management of the Disability Compensation Program has been shifted between various
agencies and entities within the District Government.    Prior to the creation of the Office

of Risk Management; disability compensation claims were managed by the Department of Employment Services (DOES) and then by the Department of Personnel (DCOP) in 2002. Pursuant to the terms of the "*Reorganization Plan No. 1 of 2003 for the Office of Risk Management*," this responsibility was transferred to the newly established District of Columbia Office of Risk Management.

The transition of claims files and financial information from DOES and DCOP to DCORM thru a Third Party Administrator was not a smooth one and unfortunately both claim files and significant data was lost in the process. In the newly created Office of Risk Management the Disability Compensation Program was managed by a Third Party Administrator, (TPA). The TPA had oversight of the claims administration process for the program which included having full responsibility for the receipt and review of all new and existing claim files.

The TPA staff was responsible for the acceptance of new claim files including but not limited to initial claim creation, coverage analysis, ongoing claim's management, payment, reserving and accurate data retention. DCORM staff was to serve as the management partner in the equation. To the detriment of the program, this management aspect was not strictly adhered to and as a result the Department began to receive significant complaints from Disability Compensation Claimants regarding the poor claims service; the improper coverage analysis being issued; and the failure to pay indemnity loss wage payments and medical reimbursements in a timely fashion. The TPA failed to properly transition both claims and data information at the close of their contract. Once again, the department was left with an inaccurate payment and reserve history, lost data, lost claim files and a program plagued by poor internal and external management controls.

As a result of the continued deficiencies of the program, new management was put in place to reorganize the department and bring the program into compliance with all statutory and legislative requirements.

Committee on Workforce Development and Government Operations
FY2006/2007 Performance Oversight Hearing
Page 2 of 9

## THE PRESENT OFFICE OF RISK MANAGEMENT

In 2006, DCORM selected a nationally known Third Party Administrator to run the program, with direct oversight of the program by having ten (10) Adjustors, three (3) Supervisors, two (2) Nurse Case Managers, two (2) Claim Assistants and one (1) Claims Manager, housed onsite for hands on management oversight; as a result, we have experienced a significant improvement in the area of service delivery.

Customer complaints have decreased more than 75%. Both medical and indemnity payment delays have diminished significantly as well. Currently, Claims Adjuster Caseloads have been reduced from in excess of 250 in FY 05 to 130 to date. This results in prompt and efficient claims adjudication within the specified time periods established by industry standards and as statutorily required.

To date approximately 95% of the outstanding reconsideration requests have been reviewed and decided upon. It is anticipated that the total inventory will have been reviewed and determinations made by the end of March 2007. In FY06 a critical vacancy in the area of Disability Compensation was filled by retaining a Return to Work Coordinator who will implement and oversee the District's Return to Work Program.

To ensure continued improvement in the area of service delivery and adherence to proper claims handling procedures and contractual terms and conditions quarterly audits are being performed on the Third Party Administrator to monitor compliance and progress. We will continue to make improvements as necessary.

Further DCORM:

- Established through the TPA an accreditation of all Medical providers to ensure legitimate and authorized treatment for claimant; upgraded the Disability Compensation data process;

- Worked with the TPA on the review and certification of the Providence Hospital Medical Clinic for all civilian Fire and EMS personnel effective January 2006;

- Updated and established in house rules, regulations and performance measures regarding the proper management of claims; In FY07, a Client Service Plan was established to serve as a reference for DCORM and representatives of the Third Party Administrator for claims handling guidelines above and beyond basic claims handling techniques.

- Inventoried, reviewed and updated 85% of all open and closed claims files.

- Continued coordinated effort with Office of the Attorney General (OAG) and Office of Inspector General (OIG) regarding overpayments made by former TPA. Coordination in conjunction with pending contract litigation in an effort to offset Plaintiff's contractual claims; Additional claim overpayments were identified and a motion was filed to stay proceedings until these claims could be resolved through separate enforcement proceeding brought by the Civil Enforcement Division.

- Completed an actuarial study as required by the CAFR that provided an estimate of the loss and loss expense reserves for the disability compensation, general liability, and automobile liability self-insurance accrual for the District of Columbia Office of Risk Management (DCORM) as of September 30, 2006.

As a result of the extensive management reform efforts undertaken in FY 2006, Management of the Disability Compensation Program went from a reportable condition in the FY 2005 CAFR, to an advisory comment in the FY 2006 CAFR.

In FY06, Tort Liability Division began to review the backlog of unresolved claims from prior policy periods. As a result of the focused review, the Tort Liability Division was able to close 882 claims, which included 89 claims that were reported during the FY06 policy period.

In addition, Tort Liability Division gained access to the Hansen System (District's Service Request tracking system). As a result, claims reported and closed from the date of access to the end of 2006, were processed in an average of 135 calendar days. This

represents a 54% reduction, compared to the prior year over the same period, claims were processed in an average of 246 calendar days. DCORM believes that gaining access to the Hansen System in conjunction with hiring seasoned claims adjusters and a true Tort Liability Manager, attributed to Tort Liability's success in resolving outstanding claims from prior policy periods.

In May 2006, Mayoral Order 2006-58, Designated of the Office of Risk Management to coordinate the Americans with Disabilities Act Compliance Program in the District of Columbia.

Through our Risk Identification, Analysis and Control (RIAC Division), DCORM has initiated a program to address the Americans with Disabilities Act (ADA) compliance issues within the District's owned and leased buildings. Partnering with the Office of Property Management who is responsible for managing the construction contracts, a completion schedule has been determined for leased and historical buildings as well as buildings that require complete renovations. This schedule also includes addressing the accessibility to the District's Homeless Shelters.

In addition, the RIAC Division acts as the point of contact between the Federal OSHA, EPA and the DC Government. In FY 06 the RIAC Division conducted 378 Inspections and 202 follow-up inspections to ensure that District agencies have complied with mitigation strategies recommended by the OIG. In addition to safety inspections the RIAC Division investigated 28 Safety and Health complaints related to building air quality index, water damage, lead and asbestos and other environmental issues.

The D.C. Office of Risk Management is charged with ensuring that District of Columbia agencies are able to continue to perform their essential functions under a broad range of circumstances. As such, in FY 06 DCORM established a Continuity of Operations (COOP) training program for the Agency Risk Manager Representatives (ARMRs) in cooperation with D.C. Emergency Management Agency, the U.S. Department of Homeland Security, the Office of Local and Government Coordination

and Preparedness, and the Office for Domestic Preparedness, in order to proactively protect health, economic, and social well-being of its workforce, citizens, and indispensable resources. This COOP training: ensures continued performance of essential functions, reduces loss of life and minimizes damage, ensures succession to office of key leadership, reduces and mitigates disruptions to operations, protects essential assets, achieves timely recovery and reconstitution from an emergency and resumes full service to internal and external customers.

## CHALLENGES FOR THE OFFFICE OF RISK MANAGEMENT

In conjunction with OCTO and CFO, DCORM needs to establish a linkage between the Disability Compensation payroll system and the District's payroll system to eliminate duplicate payments to employees expeditiously. Currently, DCORM relies on the employees Agency/Supervisor to advise us of an employees return to work. Unfortunately, for the program these forms are not returned and the duplication is not uncovered in a timely manner, thus allowing duplicate payments. To date we have uncovered in excess of $1.0 million in duplicate payments.

The establishment of this linkage will immediately eliminate the possibility of an employee getting both a disability compensation benefit and a regular payroll check after returning to full or part-time duty after an injury.

The establishment of a District wide Return to Work Program is necessary to ensure that the final piece in the disability compensation process is effectively and efficiently managed. That piece of the puzzle consists of getting the claimant back to work in a position compatible with the claimant's skill and physical capacity.

This situation can be remedied by pooling all District vacancies which create a viable pool of employment opportunities. This will then maximize DCORM's ability to coordinate the early and effective placement of workers to the benefit of all District Agencies. DCORM has met with several agencies and will continue to reinforce the need

for the light duty return to work program and gain support of all the agencies to meet that goal.

The Disability Compensation Program provides employee compensation and benefits for inactive District Government employees eligible to receive Federal or District Health and or Life Benefits. Although the program provides compensation and benefits, the Office of Risk Management considers this function a Personnel related matter. It is also duplicating the efforts of the Benefits Division of the District Office of Personnel that currently manages the employee compensation and benefits program for active District Government employees. In FY 07, merging the administrative functions under the Benefits Division of the Office of Personnel would optimize operational efficiency.

The RIAC Division continues to struggle with identifying qualified Safety Specialist for District-wide Agency Risk Manager Representatives (ARMRs). In addition, our office internally will pursue a regional search for qualified Safety Professionals to provide oversight of our District Risk Management Council.

## FY 2007 GOALS FOR THE OFFICE OF RISK MANAGEMENT

In FY 2007, DCORM is in the process of establishing a District-wide Return to Work Program by pooling all light duty vacancies to maximize DCORM's ability to coordinate the early and effective placement of workers to the benefit of all D.C. Agencies. DCORM has met with various District Agencies and will continue to reinforce the need for the light duty return to work positions in order to facilitate the placement of employees as they are released to duty.

The Disability Compensation Program information system will be upgraded from the CompManagement, Inc (CMI) system to the Sedgwick JURIS information system. The upgrade to the new system will provide additional capability to capture and report on injuries more specifically, it will facilitate the management of claims to an increased level

of customer service and provide more granular financial accounting of claims by reserve type. Additionally, DCORM will be able to migrate the Tort Liability claims from the current system to the Sedgwick JURIS system allowing the office to maintain and manage all DCORM claims data under one system.

In conjunction with OCTO and CFO, DCORM will coordinate establishment of a linkage between the S.O.A.R. system and the District's payroll system to eliminate duplicate payments to employees expeditiously. This will immediately eliminate the possibility of an employee getting both payments after returning to full or part-time duty after an injury.

In FY07 DCORM proposes an audit and assessment of the District's property exposure. The purpose of the audit is to identify the District's property exposures and risks activities and transfer those intolerable exposures through the purchase of property insurance. DCORM recognizes that a significant unforeseen loss could severely impact the District's budget and result in the need for increased taxes to restore lost facilities.

By purchasing property insurance, the District would have the budget protection from large losses, in addition to the necessary funds to restore services and facilities in a more timely fashion. Moreover, purchasing property insurance is prudent financial management for a public entity, given that the premium for property insurance can be budgeted for, while a sizeable property loss can not.

In FY 2007 DCORM in cooperation with Office of the Inspector General (OIG) DCORM will continue to maintain a database that captures all OIG recommendations to include ADA, and OSH recommendations. A review of all Office of the Inspector General's (OIG) recommendations is being performed through coordination with agency ARMRs to ensure that all OIG's recommendations have been resolved and closed following the OIG's FY 2006 audit.

In FY 2007, DCORM will provide the 34 Agency Risk Management Representatives (ARMRs) mandatory comprehensive training in Occupational Safety & Health (OSH), improving their knowledge base of the Occupational Safety & Health Act (OSHA) Regulations. This OSH training will focus on: General Safety Information, Safety Procedures and Accident Prevention, Accident/Injury Reporting, Biological Agents/Pathogens, Contractor Safety Requirements, Chemical storage, Emergency Management planning, and Fire Protection and Prevention to name a few topics.

The agency continues to make positive strides in the overall improvement of business processes, customer service and the risk management process in the District government, despite the very short period of time that I and my senior administration have been on board. We believe the District's cost of risk can be driven down even more with continued support, diligent effort, and adequate resources. We thank you for the opportunity to discuss the performance of the D.C. Office of Risk Management. We will be happy to respond to any questions you may have.



**District of Columbia Government**
**Office of Risk Management**

**March 28, 2007**
**Testimony of Kelly L. Valentine**
**Interim Chief Risk Officer**

**Council of the District of Columbia**
**Committee on Workforce Development**
**And Government Operations**
**Budget Hearing**
**FY 2008**

Good afternoon Chairman Schwartz, committee members, staff and observers. I am Kelly Valentine, Interim Chief Risk Officer for the Office of Risk Management. It is my pleasure to be here today to talk about the FY 2008 proposed budget for the D.C. Office of Risk Management (DCORM).

The mission of the Office of Risk Management is to provide risk identification, analyses, control, and financing direction, guidance, and support to District agencies so they can minimize the total cost of risk. The mission of the Office of Risk Management is accomplished by identifying and analyzing exposures to risk, selecting and implementing appropriate risk control strategies and managing incurred losses.

Pursuant to Reorganization Plan No. 1 of 2003, the Office of Risk Management is currently responsible for the administration of three main budget areas, which include the Disability Compensation Fund (BG0), the Settlements, Judgments Fund (ZH0), and the Office of Risk Management (RK0) with daily operating expenses primarily contained in RK0.

The proposed FY 2008 Office of Risk Management baseline-operating budget for the Risk Identification, Analysis and Control (RIAC) Division, the Disability Compensation Program (DCP), Tort Liability Program and Risk Administration Services is $2,368,136. This represents an increase of 14.5% or $300,733 from the FY 2007

Office of Risk Management budget. For FY 2008, the Office of Risk Management increased its intra district funding from the Disability Compensation Program to $699,134, an increase of $199,134 or 40% over FY 2007 approved budget of $500,000 to cover FTE salary increases.

Of the recommended $2,368,136, approximately $2,145,709 is for Personal Services to cover salaries, fringe benefits and other costs related to Office of Risk Management employees. The balance of $222,427 for Non-Personal Services includes necessary items like fixed costs, training, equipment, professional development, occupancy costs, telecommunications, and office supplies.

In FY 2007, DCORM is in the process of establishing a District-wide Return to Work Program by pooling all light duty vacancies to maximize DCORM's ability to coordinate the early and effective placement of workers to the benefit of all D.C. Agencies. DCORM has met with various District Agencies and will continue to reinforce the need for the light duty return to work positions in order to facilitate the placement of employees as they are released to duty.

The Disability Compensation Program information system will be upgraded from the Comp Management, Inc (CMI) system to the Sedgwick JURIS information system. The upgrade to the new system will provide additional capability to capture and report on injuries more specifically, it will facilitate the management of claims to an increased level of customer service and provide more granular financial accounting of claims by reserve type. Additionally, DCORM will be able to migrate the Tort Liability claims from the current system to the Sedgwick JURIS system allowing the office to maintain and manage all DCORM claims data under one system.

In FY 2008, to ensure continued improvement in the area of service delivery and adherence to proper claims handling procedures and contractual terms and conditions quarterly audits will continue to be performed on the Third Party Administrator to monitor compliance and progress. The Office of Risk Management is also conducting a

"best practices" study of surrounding jurisdictions to assess whether the Disability Compensation Program should be brought in –house. Further, DCORM has developed statutorily appropriate legislation to manage the Disability Compensation Program which is currently pending Executive approval. The District of Columbia is out of synch with other Regional as well as National programs of similar size and scope. We will continue to make improvements as necessary.

In conjunction with OCTO and CFO, DCORM will coordinate establishment of a linkage between the S.O.A.R. system and the District's payroll system to eliminate duplicate payments to employees expeditiously. This will immediately eliminate the possibility of an employee getting both payments after returning to full or part-time duty after an injury.

In FY2007/08 DCORM proposes an audit and assessment of the District's property exposure. The purpose of the audit is to identify the District's property exposures and risks activities and transfer those intolerable exposures through the purchase of property insurance. DCORM recognizes that a significant unforeseen loss could severely affect the District's budget and result in the need for increased taxes to restore lost facilities.

In FY 2007/08, DCORM in cooperation with Office of the Inspector General (OIG) DCORM will continue to maintain a database that captures all OIG Audit recommendations to include ADA, and OSH recommendations. A review of all Office of the Inspector General's (OIG) recommendations is being performed through coordination with agency ARMRs to ensure that all OIG's recommendations have been resolved and closed following the OIG's FY 2005, FY 2006 and FY2007 audits.

In FY 2007, DCORM will continue to provide the 34 Agency Risk Management Representatives (ARMRs) mandatory comprehensive training in Occupational Safety & Health (OSH), improving their knowledge base of the Occupational Safety & Health Act (OSHA) Regulations. This OSH training will focus on General Safety Information,

Safety Procedures and Accident Prevention, Accident/Injury Reporting, Biological Agents/Pathogens, Contractor Safety Requirements, Chemical storage, Emergency Management planning, and Fire Protection and Prevention to name a few topics.

Further, in the area of Risk Identification, Analysis, and Control, we are in the final stages of hiring a candidate for the American with Disabilities Act (ADA) Coordinator position. The ADA Coordinator will implement a citywide ADA training and compliance plan as delineated in Mayoral Order 2006-58, designating the Office of Risk Management to coordinate the Americans with Disabilities Act Compliance Program in the District of Columbia.

In closing, I would like to thank you for your time and consideration of our budget submission. I cannot emphasize enough the importance of having our baseline budget established at the $2,368,136 to help with the overall mission and deliverables of the Office of Risk Management.



District of Columbia Government
Office of Risk Management
February 28, 2006
Testimony of Kelly L. Valentine
Interim Chief Risk Officer

**Council of the District of Columbia**
**Committee on Government Operations**
**Performance Oversight Hearing**
**FY 2005 and FY 2006**

Good morning Chairman Orange, committee members and staff. I am Kelly Valentine, Interim Chief Risk Officer for the Government of the District of Columbia. I am here today to talk about the performance of the D.C. Office of Risk Management (DCORM).

I will be sharing information about the Office of Risk Managements performance for FY 2005 and FY 2006. The mission of the Office of Risk Management is to provide risk identification, analyses, control and financing direction, guidance and support to District agencies so they can minimize the total cost of risk. The mission of the Office of Risk Management is accomplished by identifying and analyzing exposures to risk, selecting and implementing appropriate risk control strategies and managing incurred losses. Although the mission of the office is multifaceted, in FY 2005 we focused the majority of our efforts on the Disability Compensation Program and organizing the Financial Division to support necessary changes.

To help explain the magnitude of the disorganization and by way of history, the management of the Disability Compensation Program has been shifted between various agencies and entities within the District Government.   Prior to the creation of the Office of Risk Management; disability compensation claims were managed by the Department of Employment Services (DOES) and then by the Department of Personnel (DCOP) in 2002.  Pursuant to the terms of the "*Reorganization Plan No. 1 of 2003 for the Office of*

*Risk Management,*" this responsibility was transferred to the newly established District of Columbia Office of Risk Management.

→ The transition of claims files and financial information from DOES and DCOP to DCORM was not a smooth one and unfortunately both claim files and significant data was lost in the process. In the newly created Office of Risk Management the Disability Compensation Program was managed by a Third Party Administrator, (TPA). The TPA had oversight of the claims administration process for the program which included having full responsibility for the receipt and review of all new and existing claim files.

The TPA staff was responsible for the acceptance of new claim files including but not limited to initial claim creation, coverage analysis, ongoing claim's management, payment, reserving and accurate data retention. DCORM staff was to serve as the management partner in the equation. To the detriment of the program, this management aspect was not strictly adhered to and as a result the Department began to receive significant complaints from Disability Compensation Claimants regarding the poor claims service; the improper coverage analysis being issued; and the failure to pay indemnity loss wage payments and medical reimbursements in a timely fashion. The

→ TPA failed to properly transition both claims and data information at the close of their contract. Once again, the department was left with an inaccurate payment and reserve history, lost data, lost claim files and a program plagued by poor internal and external management controls.

→ As a result of the continued deficiencies of the program, new management was put in place to reorganize the department and bring the program into compliance with all statutory and legislative requirements. The key issues faced by new management included:

• Staffing for all areas of the Office of Risk Management including Disability

  Compensation, Tort Liability and Risk Identification, Analysis and Control.

- Assessment of In-House Claims Management and Risk Analysis computer and data systems.

- Retention of New Third-Party Administrator through Bid Process.

- Evaluation of Outstanding Disability Compensation Claim Matters, including but not limited to *Lightfoot and Winstead* class action matters.

- Resolution of outstanding OIG audit deficiencies including but not limited to collection of overpayments made to claimants as a result of the improprieties of the former TPA in excess of $1.5 million.

- Development of Statutory Rules and Regulations for the management of the program that properly reconciles pending rules D.C. Code Subchapter 23 Disability Compensation and the "Disability Compensation Effective Administration Amendment Act of 2004," effective April 5, 2005 (D.C. Law 15-290).

- Creation of a Return to Work Program for utilization by all D.C. Governmental Agencies and their injured disability compensation public sector employees.

## **THE PRESENT OFFICE OF RISK MANAGEMENT**

In 2005 the Office of Risk Management secured several key staffing positions most significantly, a new Disability Compensation Program Manager who is an attorney with in excess of 23 years of Insurance Litigation and Claims Administration experience was hired.

In 2005, DCORM selected a nationally known Third Party Administrator to run the program, with direct oversight of the program by having ten (10) Adjustors, three (3) Supervisors, two (2) Nurse Case Managers, two (2) Claim Assistants and one (1) Claims Manager, housed onsite for hands on management oversight; as a result, we have experienced a significant improvement in the area of service delivery. Customer

complaints have decreased more than 60%. Both medical and indemnity payment delays have diminished significantly as well. Currently, Claims Adjuster Caseloads have been reduced from in excess of 250 to 195. This results in prompt and efficient claims adjudication within the specified time periods established by industry standards. Further DCORM:

- Established through the TPA an accreditation of all Medical providers to ensure legitimate and authorized treatment for claimant; upgraded the Disability Compensation data process;

- Received accreditation of the Police and Fire Clinic to be used by civilian Police, Fire and EMS personnel

- Updated and established in house rules, regulations and performance measures regarding the proper management of claims;

- Retained an outside management firm to review and update the complete claims file inventory to ensure access and accountability of all open and closed new and old claims files;

- Hired temporary employees to review backlog of outstanding request for Reconsideration of benefit determinations;

- Identified a Return to Work Program Specialist to be hired by March 2006;

- Established the DCORM/OFRM/OFIS team that successfully developed and awarded to SUNTRUST bank the Direct Daily Payment process utilized by the TPA to make both indemnity and medical payments on behalf of injured compensation employees;

- Completed an actuarial study as required by the CAFR that provided an estimate of the loss and loss expense reserves for the disability compensation, general liability,

and automobile liability self-insurance accrual for the District of Columbia Office of Risk Management (DCORM) as of September 30, 2005. The estimate of the loss and loss expense reserves reviewed were for known claims and unreported claims arising from accidents that had occurred through September 30, 2005. The two components of the reserve analysis were the case loss reserve and the (IBNR) reserve as estimated in the actuarial report. The study was completed and delivered by December 15, 2005 as requested.

- Continued coordinated effort with Office of the Attorney General (OAG) and Office of Inspector General (OIG) regarding overpayments made by former TPA. Coordination in conjunction with pending contract litigation in an effort to offset Plaintiff's contractual claims;

- Continued coordination to reduce pending disability compensation claims resulting from the ineffective management of the former TPA, which is resulting in continued reductions of claims exposure in the areas of Indemnity and Expense.

### FUTURE GOALS FOR THE OFFICE OF RISK MANAGEMENT

DCORM proposes establishing a District-wide Return to Work Program by pooling all Disability vacancies to maximize DCORM's ability to coordinate the early and effective placement of workers to the benefit of all D.C. Agencies.

In conjunction with OCTO and CFO establish a linkage between the S.O.A.R. system and the District's payroll system to eliminate duplicate payments to employees expeditiously. This will immediately eliminate the possibility of an employee getting both payments after returning to full or part-time duty after an injury.

In FY 2006, the Office of Risk Management plans to develop statutorily appropriate legislation to manage the program. The District of Columbia is out of synch with other Regional as well as National programs of similar size and scope.

In the area of Risk Identification, Analysis and Control, DCORM has initiated a program to address the Americans with Disabilities Act (ADA) compliance issues within the District's owned and leased buildings. This entails a partnership with the Office of Property Management who is responsible for managing the construction contracts. A completion schedule is currently being determined for leased and historical buildings as well as buildings that require complete renovations. We anticipate that all District-owned buildings will be ADA compliant no later than the end of FY2007 (with the exception of capital improvement projects.)

DCORM in collaboration with the Office of Property Management, Office of Personnel, Office of Human Rights, Department of Consumer and Regulatory Affairs and the Office of Attorney General are modifying Mayoral Order 94-138, dated May 25, 1994, to designate DCORM as the coordinating agency for ADA purposes and to establish compliance and monitoring procedures for District-wide implementation of the ADA regulation.

Finally, DCORM is spearheading an effort to provide the 34 Agency Risk Management Representatives (ARMRs) mandatory comprehensive training in Occupational Safety & Health (OSH), improving their knowledge base of the Occupational Safety & Health Act (OSHA) Regulations. In FY 05, the National Safety Council trained our ARMRs in the "Principles of Occupational Safety and Health Management". This week long training covered topics such as: Hazard Recognition, Safety Communication, Job Safety Analysis, OSHA and Ergonomics. A series of training courses and seminars will be conducted throughout FY06 into FY07. Special focus is being placed on Safety and Health Management, Evacuation and Emergency Planning and Continuity of Operations Planning. ARMRs will receive certificates of participation for each course and workshop attended.

The agency continues to make positive strides in the overall improvement of business processes, customer service and the risk management process in the District government, despite the very short period of time that I and my senior administration have been on board. We believe the District's cost of risk can be driven down even more with continued support, diligent effort, and adequate resources. Finally, I want to thank you for your continued support and we will be happy to respond to any questions you may have.